GASKINS, J.
Iiln this case involving the ambush killings of two police officers, the defendant, Tonya Smith, was convicted by a jury of two counts of second degree murder, three counts of possession of a firearm by a convicted felon, possession of an unregistered firearm, possession of an unidentifiable firearm, conspiracy to possess a firearm by a convicted felon, possession of methamphetamine, and possession of marijuana, third offense. The trial court sentenced the defendant to serve consecutive life sentences for the murders and concurrent maximum sentences for the other offenses. The defendant appealed, urging four assignments of error. We affirm the defendant’s convictions and sentences.
FACTS
The defendant’s convictions are the result of her participation in the murders of Detectives John Smith and Chuck Wilson in Bastrop, Louisiana, on August 10, 2007. The defendant, who was 24 years old at the time of these offenses, committed the crimes with her boyfriend, Dennis Clem. The defendant and Clem met in Texas in 2005; both of them were involved with drugs and white supremacist gangs. The defendant claimed affiliation with the Ar *389 yan Brotherhood. She had an outstanding warrant for probation violation based on North Dakota drug convictions. Clem, who was a tattoo artist, had served time in prison and was a member of the Aryan Circle.
Both Clem and the defendant had numerous tattoos with symbolic significance. Clem’s tattoos, covering most of his body, included an “AC” on his wrist and a “13” on his leg (signifying the first and third letters of the alphabet, AC, for his membership in the Aryan Circle), a huge diamond lapatch on his chest with “Aryan Pride” (with the same significance), various Nazi-style “SS” and swastika tattoos, “Kill 'em all” across his lower back and a tattoo of an AK-47 on his side captioned with “Revenge Is Easy.”
The defendant’s tattoos include a large red swastika on her upper back done with a wood-grain effect; superimposed over the swastika is a stylized Viking. According to a gang expert, the wood-grain is significant as a reference to “peckerwood,” a self-reference by white supremacist groups who call themselves “woods” and who call their female members “feather-woods.” [1] On the back of her neck, the defendant has a tattoo of Thor’s hammer, Mjollnir, which the gang expert explained to be a symbol of the pagan religion adhered to by some white supremacist groups. On one wrist, she has the Nazi-style “SS,” on the other, a swastika. On her right foot, she has a Celtic cross (which is commonly used by white supremacist groups) captioned with the number “14,” a reference to a 14-word white supremacist creed. On her left foot, the defendant has another Mjollnir hammer including another swastika and the numbers “88.” The numbers typically refer to the eighth letter of the alphabet, H, and signifying “Heil Hitler” in white supremacist circles. On her right ankle, she has a tattoo of the Confederate Naval battle flag. Her other tattoos include a pig head wearing a WWII-era German helmet bearing the “SS” symbol and another large swastika superimposed with the head of a German soldier wearing a helmet which is also emblazoned with “SS.” She also has a tattoo of a flower captioned with “Big Boy” (Clem’s nickname); that tattoo covers an |solder tattoo of a shamrock (a symbol adopted by the California Aryan Brotherhood, another white supremacist group) and the number “12,” signifying the first and second letters of the alphabet, AB, for Aryan Brotherhood. Finally, on her lower back, the defendant has a tattoo which reads “Love Thy Race.”
The defendant and Clem were arrested in 2005 while returning to the United States from Mexico with a handgun and a substantial quantity of marijuana. They were charged with federal drug and weapon offenses in Texas. The defendant pled guilty to possession of marijuana with intent to distribute while Clem pled guilty to possession of a firearm by a convicted felon. Both were sentenced to prison.
When the pair was paroled, they continued to associate with each other in violation of the terms of supervised federal release. In fact, despite repeated warnings from her probation officer to stay away from Clem, the defendant lied about her address when she was actually living with Clem at his father’s home in Houston, Texas. On July 14, 2007, a gunfight broke out at this Houston house; one of Clem’s friends was wounded. Clem then shot into the assailants’ fleeing vehicle with an assault rifle, killing two black teenagers. After gathering firearms and personal effects, the couple absconded in a Chrysler *390 LHS recently paid for by Clem for the defendant’s use.
After the shooting, Clem’s cousin came to the house and found that the pair had gone. When the cousin called the defendant, she asked the cousin to retrieve the murder weapon from underneath the house and said |4that “if I ran my mouth the same thing would happen to me.” Clem told his cousin that he wasn’t going back to prison, and in a later phone call to his uncle, Clem repeated that he wasn’t going back to prison and said that “he was going out in a blaze.”
Houston police immediately began looking for Clem and the defendant and forwarded their descriptions to the Gulf Coast Bond Offenders and Fugitive Task Force, a group of U.S. Marshals and deputies who have the resources to search for fugitives. Clem and the defendant, who had a police scanner and a list of police frequencies for Texas, were able to evade capture on two occasions.
Clem contacted his friend Alex Brendle in Louisiana and asked for assistance. On August 6, 2007, Brendle rented a room in his own name at the Best Budget Inn in Bastrop, Louisiana, for Clem and the defendant. The motel is directly across the street from the Bastrop Police Department.
In the meantime, Bastrop police were investigating Brendle for an unrelated matter. Detective John Smith of the Bas-trop Police Department was looking for Brendle to question him about a theft. On the afternoon of August 10, 2007, Detective Smith learned that Brendle had rented the room at the Best Budget Inn. He and Detective Chuck Wilson proceeded to the motel to talk with Brendle; the call was dispatched over the police radio.
The motel’s video surveillance system recorded the ensuing events. Just after 1:30 p.m., the detectives arrived and parked near the room where Clem and the defendant were staying. About 10 seconds after the detectives knocked on the room door, the door opened, and the detectives entered the |Broom.[2] The door stayed open while the detectives were inside the room. The detectives remained in the room for about one minute. Suddenly they ran out of the room, headed in opposite directions; several gunshots were audible. The person or persons firing cannot be seen. Seconds later, Clem appeared at the still-open motel room door and fired at the fleeing detectives. The shooting stopped a few seconds later; both detectives had been shot several times and had fallen. Clem then reentered the motel room and shut the door.
Four seconds later, the defendant emerged from the room, carrying her purse. As she left the room, she raised her empty hand, but not the one holding the purse.[3] She looked to her left and right, toward the fallen detectives, and proceeded across the parking lot away from the room. She walked at a normal pace. Less than 10 seconds later, she encountered the hotel manager in the parking lot, and the two had this exchange:
Manager: What happened?
Defendant: I have no idea. I have no idea. Call the cops. Call the cops *391 and call an ambulance. Is that the police station?
The defendant then left the scene.
Within minutes, several nearby police officers who heard the gunshots arrived at the scene of the shooting and established a perimeter around the motel room. Paramedics also arrived and began tending to the |fifallen detectives. Clem burst from the motel room, bare-chested and with a gun in each hand, firing wildly. Two of the paramedics were wounded. The officers returned fire, hitting Clem 15 times; he died at the scene.
Both of the detectives died of multiple gunshot wounds. Detective Smith had been shot six times, including one gunshot wound to the face. Detective Wilson was shot three times. The weapons of both officers were found still in their holsters.
The defendant fled to Texas. After interviewing Aryan Circle members, the fugitive task force located the defendant hiding in an RV trailer at a Houston trailer park. The marshals arrested the defendant on August 12, 2007. As she was being arrested, the defendant said: “You’re lucky I didn’t know you were coming this time.” The defendant still had the same purse she was carrying when she left the motel. The marshals did not find any weapons on the defendant when she was arrested.
Investigation of the crime scene at the motel yielded a variety of evidence. The two handguns Clem was firing when he was killed were a Hi-Point .45 caliber and a Taurus 9 mm. In addition to nine .45 caliber shell casings from the Hi-Point handgun fired by Clem, police found a total of 289 mm shell casings from the Taurus — seven inside the motel room and 21 outside the motel room. One 9 mm CBC shell casing, which was located near a PVC pipe just outside the door threshold of the motel room, was not matched to any gun recovered at the scene. Evidence suggested that Clem and the defendant had possession of another 9 mm pistol which was never recovered.
17Inside the motel room, police found a quantity of unfired ammunition and a rifle cleaning kit. Clem and the defendant also had the police scanner and a stun gun. In the pocket of a pair of the defendant’s pants, police found a quantity of methamphetamine. In addition to drug paraphernalia, a baggie full of marijuana was also recovered from the room.[4] One officer testified that when he entered the motel room, he smelled “a strong odor of marijuana.” Many of the drug and firearm items were in plain view.[5]
The pair had been traveling with a number of photo albums including pictures of themselves; in several of these photos, the defendant can be seen making the Aryan Circle gang hand sign, sometimes in the presence of other people with white-supremacist tattoos. In two other photos, the defendant and Clem are each seen giving a one-arm-raised Nazi-style salute, and in the background is hand-drawn art containing swastikas and the number 14. Some of this Nazi/Norse mythology-themed art was found in the room as well. In the defendant’s car, police found a handgun, an SKS assault rifle, and a shotgun whose barrel had been sawn off to less than 18 inches in length.
The defendant was charged with two counts of second degree murder; she was *392 also charged with an array of other offenses related to the guns and drugs found at the scene. The state provided the defendant with notice of its intent to use other crimes evidence concerning her conduct prior to the |8murders. The defendant filed a motion to sever the drug and gun charges from the murder charges, which motion the trial court denied.
The defendant’s jury trial was held in Bossier Parish due to the publicity attending these events in the Bastrop area. The jury voted 10 to 2 to convict the defendant of the murder charges and unanimously as to all of the other charges. The court sentenced her to the mandatory life terms for the murders and imposed these sentences consecutively. The court also imposed maximum sentences of imprisonment for the remaining offenses but imposed those sentences concurrently with the other sentences.[6]
The defendant appealed, urging four assignments of error.
SUFFICIENCY OF EVIDENCE
The defendant argues that the evidence was insufficient to prove beyond a reasonable doubt that she was guilty of the second degree murder of either of the police officers.
La. R.S. 14:30.1 provides, in part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... aggravated escape ... even though he has no intent to kill or to inflict great bodily harm.
Aggravated escape is defined in La. R.S. 14:110:
C. (1) Aggravated escape is the intentional departure of a person from the legal custody of any officer of the Department of Public Safety and Corrections or any law enforcement officer or from any place where such person is legally confined when his |9departure is under circumstances wherein human life is endangered.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d *393 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by | inviewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, writ denied, 2007-2053 (La.3/7/08), 977 So.2d 896.
Flight indicates consciousness of guilt and is a circumstance from which a jury may infer guilt. State v. Gatti, 39,833 (La.App.2d Cir.10/13/05), 914 So.2d 74, writ denied, 2005-2394 (La.4/17/06), 926 So.2d 511.
The state’s theories of the defendant’s guilt are: (1) that the defendant actually fired one or more of the shots at the officers; (2) that the defendant was a principal to the crimes; and (3) that the defendant was engaged in .aggravated escape at the time of the offenses.
There is some evidence to prove that the defendant may have fired one of the initial shots in the hotel room; in particular, one spent 9 mm shell casing at the doorway was not matched to any firearm found at the scene. Given the quantity of drugs and weapons in the defendant’s hotel room, there is also some evidence to prove that the defendant may have been escaping from the custody of these two officers and thus participating in an |, aggravated escape. However, the evidence is ample to prove beyond a reasonable doubt that the defendant is guilty of the murders as a principal.
La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
In State v. Tate, supra, the supreme court observed:
Not all principals are automatically guilty of the same grade of the offense; thus, a principal may be charged with and convicted of a higher or lower degree of the crime, depending on the mental element proved at trial. An individual may be convicted only for those crimes for which he personally has the requisite intent. It is not enough that his accomplice have the intent, the State must prove that the defendant had the required mental element.
Specific intent is a state of mind that may be inferred from the circumstances of the transaction and the actions of the accused. To establish specific intent the state must show that the defendant pulled the trigger, that he acted in concert with his co-perpetrator, or that he actively acquiesced in the use of deadly force. [Citations omitted.]
The evidence demonstrated that the defendant and Clem were “on the run” from law enforcement authorities in Texas after Clem shot and killed two young men during an altercation in Houston. The testimony indicated that the defendant participated in this crime by handing Clem the weapon and then later threatening Clem’s *394 cousin about “running his mouth.” The pair was staying across the street from the police station in the Best Budget Inn motel in a room registered under the name of one of Clem’s friends; they were hiding out in this motel room with an arsenal of firearms and a police scanner to monitor the effort to capture them. They also had quantities of 112methamphetamine and marijuana, as well as drug paraphernalia for partaking of these drugs. On the day of the murders, the presence of these drugs was readily detectable by sight and smell.
The evidence also showed that Clem was a member of a violent Aryan Circle prison gang. It further demonstrated that the defendant had closely identified herself with Clem and this gang through her gang tattoos, frequent use of gang signs, and association with other white supremacists. Clem had repeatedly voiced his preference to die, violently if need be, rather than return to prison.
On the day of the murders, the defendant and Clem remained together in the motel room until after the crimes were completed. By her own subsequent admission, they knew that the police were coming. The defendant admitted the two police detectives — one of whom was African-American — into the motel room, which reeked of marijuana and contained firearms and visible drug paraphernalia. Also inside was her white supremacist boyfriend who had recently committed murder in her presence and had vowed not to return to prison. The officers apparently engaged someone in the room in conversation for approximately one minute before the shooting started. During this time, the defendant could have changed the course of these events by surrendering to the officers or warning them of the volatile situation they were in and allowing them to escape. However, the defendant chose another path, and she elected to send the two officers to their deaths.
Immediately after the detectives were shot, the surveillance video showed the defendant walking calmly away from the motel room. She | ^looked left and right before walking away to freedom as the two officers lay bleeding on the pavement beside her. In the course of her escape, she lied to the motel owner that she did not know what had just happened. She then asked if a nearby building was the police station. Instead of remaining at the motel or walking across the street to the police station, she fled to Texas where she was hidden by members of the Aryan Circle. The jury was entitled to infer the defendant’s consciousness of guilt from her flight from the murder scene. Perhaps most telling of all, when she was arrested by members of the fugitive task force, the defendant told them that they were lucky she didn’t know they were coming “this time.” There can be no doubt that the defendant was a willing partner with Clem in the murders of Detective Smith and Detective Wilson.
This assignment of error is without merit.
OTHER CRIMES EVIDENCE
In this assignment of error, the defendant argues that the trial court should not have admitted evidence (1) of her affiliation with the Aryan Circle white supremacist gang and (2) of the Houston shooting.
La. C.E. art. 404 provides, in part:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, *395 identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
| MThe state must provide the defendant with notice and an opportunity for a hearing before trial if it intends to offer such evidence. State v. Prieur, 277 So.2d 126 (La.1973). Additionally, the state must prove that the defendant committed the other acts, and the probative value of the other crimes, wrongs or acts evidence must outweigh its prejudicial effect. State v. Galliano, 2002-2849 (La.1/10/03), 839 So.2d 932. A trial court’s ruling on the admissibility of such evidence will not be overturned absent an abuse of discretion. State v. Stepp, 28,868 (La.App.2d Cir.12/11/96), 686 So.2d 76, writ denied, 97-0410 (La.6/30/97), 696 So.2d 1006.
In the instant case, the other crimes evidence was highly relevant in many respects. The evidence of the defendant’s Aryan Circle affiliation was relevant to explain the defendant’s intent and knowledge at the time of the killings. The evidence demonstrating this affiliation included the numerous highly visible and very unusual tattoos adorning the defendant and Clem. These tattoos contain mythological figures, Nazi emblems, and a variety of numbers and acronyms. Expert testimony given at trial explained what the tattoos represented and how they tied into the white supremacist mind-set of this couple. Additionally, the record contains photos of the defendant socializing with members of the Aryan Circle; in some photos, the defendant herself is shown making gestures associated with white supremacist groups.
The fact that the defendant strongly shared a white supremacist ideology with Clem was highly probative and tended to explain her actions pertaining to the instant offenses. It also served to discount defense counsel’s assertion that the defendant was a battered woman upon whom |1BClem forced tattoos and his racist beliefs. Nothing in this record indicates that the tattoos were forced on the defendant or that she was compelled against her will to make Nazi and Aryan Circle gestures or associate with Aryan Circle members.
Likewise, the evidence of the Houston shootings explained many of the actions of Clem and the defendant. In particular, it supplied a motive as to why they both might want to evade capture at any cost. While the testimony of the Texas law enforcement officers indicated that Clem shot the two young men, it also suggested that the defendant handed the gun to him. There was testimony from Clem’s cousin that the defendant unsuccessfully tried to get him to retrieve that murder weapon from the spot where it was concealed at the Houston crime scene and that she threatened this man with death if he talked. At an absolute minimum, both the defendant and Clem, who were convicted felons on federal supervised release at the time of these crimes, faced being returned to prison for possession of firearms. The mere fact of their association with each other was a violation of federal supervised probation. The evidence of the events in Texas also tended to show that the defendant was an active participant in the couple’s flight from police, rather than merely being “along for the ride.” In fact, it is noteworthy that even after she parted ways with Clem at the motel, she continued to flee from the police until she was captured by the fugitive task force.
*396 The trial court correctly allowed this evidence to be admitted; this assignment of error is without merit.
J^FAILURE TO SEVER CHARGES
The defendant urges that the trial court should have severed the various drug and firearm charges from the murder charges. She argues that she might have chosen to testify in the murder trials had those charges been tried separately from the other matters, but the joinder effectively prevented her from doing so.
La. C. Cr. P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
For purposes of appellate review, whether the claim involves misjoin-der of offenses, prejudicial joinder, or improper consolidation, the defendant must show prejudice to establish that trial of two or more crimes in a single proceeding “affect[ed] his substantial rights.” State v. Crochet, 2005-0123 (La.6/23/06), 931 So.2d 1083, citing La. C. Cr. P. art. 920 and State v. Strickland, 94-0025, p. 13 (La.11/1/96), 683 So.2d 218, 226. Proper considerations for the trial court to use in evaluating joinder are “whether the jury would be confused by the various charges; whether the jury would be able to segregate the various charges and evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition and finally, whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.” Crochet, supra, citing State v. Washington, 386 So.2d 1368, 1371 (La.1980).
In the instant case, all of the offenses joined were part of a single criminal scheme or plan by the defendant and Clem. They possessed firearms (prohibited because of their prior felony convictions) and illegal drugs. The illegal presence of these items in their motel room and car provided part of the motive for their violent resistance to law enforcement. The suggestion that the defendant’s trial strategy might have been different had the drug/firearm offenses been severed is purely hypothetical, and at any rate, any prejudicial effect the joinder had on that decision would be outweighed by the defendant’s desire to escape cross-examination of her testimony.
Because the joinder was proper and because no prejudice has been demonstrated, this assignment of error is without merit.
EXCESSIVE SENTENCES
Finally, the defendant argues that her two consecutive life sentences are excessive, contending that the trial court should have imposed the sentences concurrently.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La. C. Cr. P. art. 883. Concurrent sentences arising out of a single course of conduct are not mandatory. State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La.1988).18 It is within a trial court’s discretion to order sentences to run consecutive *397 ly rather than concurrently. State v. Johnson, 42,323 (La.App.2d Cir.8/15/07), 962 So.2d 1126.
When consecutive sentences are imposed, the trial court shall state the factors considered and its reasons for the consecutive terms. State v. Ashley, 44,655 (La.App.2d Cir.9/23/09), 22 So.3d 1045. Among the factors to be considered are the defendant’s criminal history; the gravity or dangerousness of the offense; the viciousness of the crimes; the harm done to the victims; whether the defendant constitutes an unusual risk of danger to the public; the potential for the defendant’s rehabilitation; and whether the defendant has received a benefit from a plea bargain. State v. Ashley, supra.
The record does not reveal that the defendant made or filed a motion to reconsider sentence. In such cases, a defendant is relegated to a bare claim of constitutional excessiveness. La. C. Cr. P. art. 881.1; State v. Mims, 619 So.2d 1059 (La.1993). Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992); State v. Livingston, 39,390 (La.App.2d Cir.4/6/05), 899 So.2d 733; State v. White, 37,815 (La.App.2d Cir.12/17/03), 862 So.2d 1123.
We find that the defendant’s consecutive life sentences are not excessive. In order to further their escape, the defendant and her boyfriend ambushed and murdered two police officers who were not even looking for them; instead they were searching for a companion wanted for theft. The trial court provided ample and accurate justification for the imposition of the | |9consecutive sentences. Foremost among the reasons was the gravity of the defendant’s conduct in participating in the ambush and the grievous and irreparable injury to the families of the murdered officers, as well as the defendant’s criminal history and her several unsuccessful efforts at rehabilitation.
This assignment of error is without merit.
CONCLUSION
The defendant’s convictions and sentences are affirmed.
AFFIRMED.
BROWN, C.J., concurs with reasons.

. A nickname used by the defendant is "Light Feather.”

. The defendant and Clem were the only individuals in the room when the detectives arrived. The clothing of the person who opens the door appeared to be similar to that worn by the defendant when she is seen leaving only minutes later. Clem, on the other hand, was wearing only shorts when seen minutes later on the video.

. The contents of her purse are unknown; however, the size of the purse was such that a handgun would have fit inside.

. In a post-mortem toxicology study, Clem tested positive for methamphetamine and marijuana.

. However, when the motel owner was in the room two days before the shooting to repair the air conditioning, he did not observe any drugs or firearms.

. Where applicable, the trial court also generally imposed the mandatory minimum fines.