GASKINS, J.
_jjThe defendant, Lavern Lee Hampton, was convicted of second degree murder and sentenced to serve the mandatory sentence of life in prison without the benefit of parole, probation, or suspension of sentence. The defendant has appealed, arguing that the evidence is insufficient to support the conviction. For the following reasons, we affirm the defendant’s conviction and sentence.
FACTS
The defendant had been in a relationship with Vonkeisha Drake for four years. He lived with Ms. Drake and her two children at the home of Ms. Drake’s cousin, Angela Chapman. Ms. Chapman and her three children also lived in the house. The relationship between the defendant and Ms. Drake deteriorated and the defendant was asked to move out.
On August 14, 2008, shortly after the breakup, the defendant went to Ms. Chapman’s house to talk to Ms. Drake. Otis King, a family friend of Ms. Chapman, was at the house along with Bruce Johnson. According to Ms. Chapman, the defendant came from behind the house and charged at Ms. Drake. Mr. King stepped in front of the defendant to protect Ms. Drake. The defendant swung at Mr. King.
Mr. King and the defendant got into a tussle. Mr. King was larger than the defendant and was able to subdue him. Mr. King held the defendant down until he begged to be released. Mr. King allowed the defendant to get up. As he was walking away, the defendant said to Mr. King, “I got you.”
|gAt some point that day after leaving Ms. Chapman’s house, the defendant passed by a residence where Joshua James and several other men were sitting outside. The men observed that the defendant had been in a fight. The defendant related the tale of his altercation with Mr. King. According to the defendant, the men offered to return to Ms. Chapman’s house with him. The defendant decided to return to the Chapman residence to settle the score with Mr. King. The defendant armed himself with a big stick or log and Mr. James accompanied him to the Chapman house where they waited for Mr. King.
Mr. King had driven Ms. Chapman, one of her children, and Ms. Drake to a convenience store. The group arrived at Ms. Chapman’s house late in the evening, be *616 tween 9:00 and 11:00 p.m. Ms. Drake and the child headed into the house followed by Ms. Chapman and Mr. King. The defendant and Mr. James came from behind the house on opposite sides and grabbed Mr. King, preventing him from entering the house. The women ran inside. The defendant knocked on the window with the large stick and told Ms. Drake, “I’m going to get you next.”
The defendant hit Mr. King in the head several times with the stick, causing a large gash on the back of the victim’s head. Mr. James had a gun and hit Mr. King in the head with it several times. At some point, either the defendant or Mr. James had a knife and stabbed Mr. King multiple times. One wound punctured Mr. King’s heart and two other wounds entered his lung. The victim’s wallet was taken and the two left the scene. Mr. King [ sbled to death from his wounds. Police were' summoned and the defendant was identified as one of the perpetrators.
Detective Quinton Holmes of the Monroe Police Department called the defendant’s cell phone number around 3:00 or 4:00 a.m. the next morning, but did not get an answer. Detective Holmes called the number again around 6:15 a.m. and the defendant answered. The defendant said he knew that Detective Holmes was a cop and stated, “I didn’t kill anyone.” Detective Holmes asked if he could come and pick the defendant up to talk to him. The defendant stated he would meet Detective Holmes at a local restaurant, but did not appear.
Another member of the Monroe Police Department knew where the defendant lived and officers went to that area, which was consistent with a GPS location of the defendant’s cell phone supplied by the defendant’s cell phone provider. Officers saw the defendant, who began running through a yard and an alley. After a two-block foot pursuit, the defendant was apprehended. The defendant asked to get his cell phone which was in the house being charged. The police retrieved the cell phone.
The defendant was arrested and advised of his Miranda rights; he then gave a statement to the police. The defendant detailed his original fight with Mr. King and admitted going to Ms. Chapman’s house a second time with another man, whose name he did not know, in order to settle the score with Mr. King. The defendant stated that he hit Mr. King in the head twice with a large stick, but claimed that the other man fought with the victim and took his wallet. Various scratches and cuts were observed on the ^defendant’s hands and torso. He claimed that he received the injuries when he fought with Mr. King the first time. He later said he was injured when he was arrested by the police.
After his interview, the defendant was transported by Detective Holmes. Detective Holmes asked the defendant who aided him in committing this crime. The defendant stated that he could assist in locating the man who helped him attack Mr. King. The defendant directed Detective Holmes to a house which the detective knew was inhabited by people who would not be cooperative with law enforcement officials. After calling for assistance from other officers, the male residents were cleared out of the house and positioned where the defendant could see them from his seat in the police car. Among the individuals was Joshua James, whom the defendant identified as the person who participated in the beating and murder of Mr. King. A search of the house yielded the victim’s wallet. Three shirts were found in a trash can behind the house. In the backyard, police recovered another shirt and a bicycle. In a search of Mr. *617 James incident to his arrest, police recovered several credit cards and other cards belonging to Mr. King. Mr. James eventually directed officers to where they could recover the handgun used to beat Mr. King.
The defendant was charged by grand jury indictment with second degree murder. He was tried by jury and convicted of the second degree murder of Mr. King. The defendant filed a motion for post verdict judgment of acquittal and alternatively, a motion for new trial, claiming that the evidence was insufficient to support his conviction. The motions were | ^denied by the trial court. The defendant was sentenced to serve the mandatory sentence of life in prison without benefit of parole, probation, or suspension of sentence. The defendant appealed.
SUFFICIENCY OF THE EVIDENCE
On appeal, the defendant contends that the evidence was not sufficient to support his conviction for the second degree murder of Mr. King. According to the defendant, the state’s case against him was based entirely upon circumstantial evidence. The defendant argues that the state failed to show that he was involved in the armed robbery of Mr. King and failed to prove that he had the specific intent to kill the victim or that he actively desired the victim’s death. The defendant asserts that the state failed to prove that he inflicted any of the multiple stab wounds that killed Mr. King. The defendant also claims that the state failed to prove that he was a principal to murder because it failed to show that he aided or abetted in the robbery or indirectly counseled or procured another to commit the crime. These arguments are without merit.
Legal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Smith, 44,998 (La.App.pdfi Cir.3/31/10), 34 So.3d 386, writ denied, 2010-0980 (La.12/10/10), 51 So.3d 722. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Smith, supra. The appellate court does not assess the credibility of witnesses or reweigh evidence. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Smith, supra.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Smith, supra; State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.
The offense of second degree murder is defined by La. R.S. 14:30.1 which provides in pertinent part:
*618 |7A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily-harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery, first degree robbery, second degree robbery, simple robbery, ... even though he has no intent to kill or to inflict great bodily harm.
To support a conviction of second degree murder under La. R.S. 14:30.1(A)(1), the state must show that the defendant had specific intent to kill or inflict great bodily harm. See State v. Ruffins,. 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614. Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Smith, 41,048 (La.App.2d Cir.6/30/06), 935 So.2d 797. As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, 1996-1991 (La.2/21/97), 688 So.2d 521.
The state is not required to show that the defendant’s conduct was the sole proximate cause of the victim’s death in order to satisfy the causation element of this offense. Sufficient proof is presented where it is shown that the defendant’s actions were a “contributing cause” or a “substantial factor” in the resulting death of the victim. State v. Stone, 33,383 (La.App.2d Cir.5/15/00), 758 So.2d 997, writ denied, 2000-2145 (La.6/1/01), 793 So.2d 181.
|8Under La. R.S. 14:30.1(A)(2), no intent to harm or kill is necessary to be a principal to second degree murder occurring during the course of a robbery. State v. Grant, 623 So.2d 204 (La.App.2d Cir.1993), writ denied, 629 So.2d 400 (La.1993); State v. Brown, 43,775 (La.App.2d Cir.12/3/08), 999 So.2d 179, writ denied, 2009-0047 (La.9/25/09), 18 So.3d 81.
Regarding the law of principals, La. R.S. 14:24 provides:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure'another to commit the crime, are principals.
Only those persons who knowingly participate in the planning or execution of a crime are principals. Mere presence at the scene is therefore not enough to “concern” an individual in the crime. Moreover, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Pierre, 631 So.2d 427 (La.1994). All persons concerned in the commission of an offense, either directly or indirectly, are principals in the crime and culpable according to the mental state they possess at the time of the offense. It is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention. State v. Anderson, 1997-1301 (La.2/6/98), 707 So.2d 1223.
| pDiscussion
Ms. Chapman testified at trial that her cousin, Ms. Drake, lived with her at her house, along with Ms. Drake’s boyfriend, the defendant. The women’s chil *619 dren also lived in the house. Ms. Chapman stated that she asked the defendant to move out of the house. Ms. Chapman testified that on August 14, 2008, the defendant came from behind the house and charged at Ms. Drake. Mr. King was present. He stepped in front of Ms. Drake and told the defendant, “You ain’t fixing to fight her while I’m around here at Angie’s house.” The defendant started swinging and Mr. King was able to get the defendant down on the ground. The defendant begged to be let up and Mr. King complied. As the defendant was leaving, he said to Mr. King, “I got you.”
At approximately 11:00 p.m., Ms. Chapman returned from a convenience store with Mr. King and Ms. Drake. Ms. Chapman testified that when the group tried to enter the house, some boys pulled Mr. King out of the house, preventing him from entering. She stated that there were three attackers, one of which was the defendant. Ms. Chapman said she saw a gun lying on an old refrigerator outside the house. A struggle ensued between the men and Mr. King. According to Ms. Chapman, the defendant was holding a log; he tapped on a window of the house and told Ms. Drake, “I’m going to get you next.” After the fighting stopped, Ms. Chapman looked out and saw that Mr. King was bleeding to death.
Ms. Drake testified that at the time of this incident, she was living with her cousin, Ms. Chapman. The defendant had been her boyfriend and |10had lived with her at the house, but he had been asked to leave. Mr. King was a friend of Ms. Chapman’s and was at the house when the defendant came by on the day of this incident. The defendant was wearing basketball shorts and no shirt. Ms. Chapman saw the defendant, and called out to Ms. Drake to watch out because the defendant was behind her. Ms. Drake stated that the defendant was coming toward her like he was going to jump on her. Mr. King told the defendant that none of that was going on at Angela’s house. The defendant struck Mr. King and the two wrestled in a ditch. Mr. King held the defendant down until eventually the defendant asked to be let go. When Mr. King released him, the defendant indicated that he was going to get Mr. King.
Later that night, Mr. King took Ms. Chapman and Ms. Drake to a store. When they returned to the house, Ms. Chapman pushed Ms. Drake into the house. Ms. Drake testified that she saw the defendant outside the window holding a log or tree branch that was 14 to 16 inches long and as thick as the defendant’s forearm. It took both hands for the defendant to hold it. When Ms. Drake asked the defendant what he was doing with the log, he told her to shut up and that she was next. Ms. Drake stated that she never saw the defendant with a gun or a knife.
Detective Holmes testified at trial and outlined the events leading up to the arrest of the defendant, which are set forth above. Detective Holmes stated that blood was found on the door frame of the house where the defendant’s cell phone was located. Detective Holmes also detailed the fact lnthat the defendant gave a statement and led investigators to arrest Mr. James.
Detective Mark Nappier of the Monroe Police Department was present when the defendant gave his statement. Detective Nappier stated the defendant identified Mr. James as the individual who helped him attack Mr. King. When Mr. James was arrested, he had in his possession the victim’s credit cards and other cards. Detective Nappier also identified pictures of the defendant’s injuries taken on the day he was arrested for this offense. Detective Nappier testified that he had 18 years’ *620 experience as a police officer and that it was not uncommon for someone using a knife to sustain cuts. Among the defendant’s injuries photographed at his arrest were small cuts on his hands consistent with the use of a knife.
Following his arrest, the defendant gave a státement to police. He stated that he went to Ms. Chapman’s house to talk to his girlfriend, Ms. Drake. He claimed that Mr. King ran around a truck and rushed him and they had a fight. While Mr. King had the defendant on the ground, the defendant gave up. After leaving the Chapman residence, the defendant went to a house on Crescent Drive where he had left his bicycle. Several men were sitting outside and noticed that the defendant had been in a fight. They offered to go back to the Chapman house with the defendant. The defendant stated that he was wearing shorts and a black hat with the letter “L” on it. He was carrying his shirt in his hand. The defendant and one of the men went back to the Chapman residence. The defendant claimed that he did not know the man’s name. The man was later identified as Mr. |12James. The defendant stated that Mr. James had a gun and the defendant was carrying a large stick. The defendant said that he went back to the house to get revenge on Mr. King. He stated that they walked through an alley and came around on opposite sides of the house. The defendant admitted hitting Mr. King in the head twice with the stick before Mr. James jumped into the altercation. According to the defendant, Mr. James hit Mr. King with the gun and took Mr. King’s wallet.
Captain Richard B. Jones of the crime scene identification division of the Monroe Police Department testified regarding the collection of evidence. He made photographs at the Chapman residence where Mr. King was killed and collected fingerprints and blood from a car and a truck at the residence. He took swabs from a refrigerator and a fence post at the scene. DNA analysis showed that the blood came from Mr. King.
At the house where Mr. James was arrested, a trash can was searched and photographed which contained three shirts and the victim’s wallet. A black shirt was found by the porch. A bicycle was found behind a storage building and a shirt was on the ground next to the bicycle. A white T-shirt tested positive for blood, but no DNA could be extracted from it. A tank top found behind the storage shed at Mr. James’s house tested positive for blood. The DNA showed that the blood was consistent with the victim, Mr. King. The shirt also showed non-blood DNA from a major contributor who was determined to be Mr. James. DNA from another individual was also present, but could not be identified. A shirt found in the backyard of Mr. James’s residence contained blood which was shown to have come from the [ isvictim. The gun recovered from Mr. James, which was used in the beating of Mr. King, had blood on it. The DNA analysis showed that the blood belonged to Mr. King.
At the house where the defendant was arrested, two streaks of blood were found on the front door, at hand height. DNA analysis showed that the blood belonged to the defendant. The defendant’s cell phone was found in the house. In the alley behind the house, police retrieved a black cap with the letter “L” on it. A pair of underwear taken from the defendant when he was arrested tested positive for the defendant’s blood.
Dr. Frank Peretti testified as an expert in forensic pathology. He performed the autopsy on Mr. King and stated that the victim had multiple stab and cutting wounds and multiple blunt force head inju *621 ries. Dr. Peretti described one blunt force injury to the head which was likely caused by something like a two-by-four or a baseball bat. The wound would have caused profuse bleeding. Other injuries were consistent with pistol whipping.
Among the abrasions and bruises on the body, Dr. Peretti noted superficial cuts on the victim’s arms classified as defense wounds inflicted by a knife. The victim had numerous stab wounds to his torso that did not penetrate deeply. Two stab wounds on the right side of the chest penetrated into the chest cavity. One wound entered the upper lobe of the right lung and the other wound entered the lower lobe. A stab wound on the left chest went into the pericardial sac and terminated in the right ventricle of the heart. Another stab wound entered the abdomen, but did not strike any |umajor organs. According to Dr. Peretti, the stab wounds to the lung and heart were the cause of Mr. King’s death. However, his other wounds, including the head wound, caused loss of blood which also contributed to the victim’s death.
The grand jury indictment against the defendant simply charges him with second degree murder, a violation of La. R.S. 14:30.1. It does not specify whether he violated La. R.S. 14:30.1(A)(1) or La. R.S. 14:30.1(A)(2). The evidence in this case clearly establishes all the elements of either charge beyond a reasonable doubt.
Under La. R.S. 14:30.1(A)(1), the state was required to show that the defendant had the specific intent to kill or inflict great bodily harm. The defendant erroneously argues that the state had to prove specific intent to kill. In this case, the defendant admitted arming himself with a log or large tree branch, enlisting the aid of Mr. James, going to the Chapman residence, lying in wait for Mr. King, and ambushing him. The defendant also admitted striking the victim in the head with the log or branch at least twice. The victim sustained a large gash on his head which bled profusely and contributed to his death. These facts show that the defendant participated in a brutal attack upon Mr. King and the defendant had, at the very least, the requisite specific intent to inflict great bodily harm. This is sufficient evidence upon which to base the defendant’s conviction for second degree murder.
Further, although it is unclear whether the defendant or Mr. James wielded the knife which inflicted the fatal wounds upon Mr. King, the |1fidefendant was at least a principal to second degree murder by virtue of the fact that he returned to the Chapman residence with Mr. James in order to attack Mr. King. If Mr. James inflicted the stab wounds, by enlisting and accepting the aid of Mr. James in ambushing Mr. King, the defendant directly or indirectly counseled or procured Mr. James to commit the crime. This is sufficient evidence upon which to base the defendant’s conviction for the offense charged.
Finally, the defendant and Mr. James acted together in ambushing and attacking Mr. King. During the course of the fatal attack, the victim’s wallet was stolen. This constitutes sufficient evidence for the trier of fact to conclude that the defendant was at least a principal to felony murder under La. R.S. 14:30.1(A)(2), which does not require the finding of specific intent to harm or kill.
Based upon this record, the evidence was ample to find that the defendant committed the essential elements of second degree murder beyond a reasonable doubt. The defendant’s arguments to the contrary are baseless.
*622 CONCLUSION
For the reasons stated above, we affirm the conviction and sentence of the defendant, Lavern Lee Hampton, for second degree murder.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, GASKINS, PEATROSS and DREW, JJ.
Rehearing denied.