STEWART, J.
|,The defendant, Farrell M. Rochelle, was found guilty as charged of being a principal to second degree murder in violation of La. R.S. 14:30.1 and La. R.S. 14:24. He was sentenced to life imprisonment, to be served without the benefit of probation, parole, or suspension of sentence, with credit for time served. For the reasons set forth below, we affirm the defendant’s conviction and sentence.
FACTS
On March 25, 2010, the defendant, Cad-dara Hogan[1] and Paris Smith, were initially charged via bill of indictment with first degree murder during the attempted perpetration of an armed robbery, in violation of La. R.S. 14:30. The indictment was subsequently amended to the charge of principal to second degree murder in violation of La. R.S. 14:30.1 and La. R.S. 14:24. The defendant and Smith were tried together, and the jury trial commenced on March 20, 2012. The following evidence was adduced at trial.
Rena Carroll Lee, also known as “Lok-ie,” testified that Ronald Wilson, also known as “Paintbrush,” arrived at her home at approximately 7:00 p.m. on February 3, 2010. According to Lee, Wilson frequented her home once or twice a week for sex and to use drugs. On the night in question, Lee stated that she and Wilson talked and watched television while he was using drugs. Wilson was sitting in a chair by the door, while Lee was sitting on her couch with her back to the door.
Lee testified that she heard a loud noise, and turned to look in the direction the noise came from. She saw her door was open, and a man 12standing there holding a gun. Lee testified that the man was wearing a black hoodie and had a bright grey and white “ski scarf’ wrapped around his face. The man pointed his gun at Wilson, and asked “Where’s the money?” In turn, Wilson asked “What money?” The man then shot Wilson in the foot. After the man asked Wilson a second time about the money, he stated that the money was in his truck. The man instructed Wilson to go get the money. Lee stood with Wilson and began to walk outside, but the man instructed her to go inside and close the door. As she closed the door, she observed two more people standing outside. Lee then heard bumping against the side of her house, followed by a series of eight gunshots.
After it became quiet outside, Lee opened the door and called Wilson’s name to no avail. She attempted to call 9-1-1 twice, but received a busy signal both times. By that time, her neighbors called her to come out of her house, and she remained with them until the police arrived.
John Scroggins, Lee’s neighbor, testified that he came home at approximately 7:00 p.m. on February 3, 2010. He was watching television when he heard a popping noise that he believed was a gunshot. He soon heard what he thought to be another *535 gunshot, followed by a booming sound that he believed came from a larger gun. When Scroggins went to his window to see what was going on, he witnessed three African-American men and a white dog running up the road. He described two of the men as tall, and the third man as a “little ole short rascal.” Scroggins could not recall what they were wearing.
| ^Detective Adam Ewing of the DeSoto Parish Sheriffs Office investigated Wilson’s murder. Ewing testified that when he arrived at the scene, he learned that there had been a robbery. He testified that someone had kicked the door into the home, shot Wilson in the foot, and taken him out to his vehicle at gunpoint. At some point, Wilson armed himself with a shotgun he had in his truck. A struggle ensued, and Ewing stated that the authorities assumed that Wilson was shot during the struggle.
Wilson was found lying on his back outside of the home, with his 12-gauge shotgun lying beside him. It was determined that Wilson had “got off two shots.” Even though the investigation did not reveal exactly how many shots were fired, Detective Ewing was able to prove that at least four shots were fired, two from a “pistol” and two from Wilson’s shotgun.
Detective Ewing related that the authorities had recovered a projectile from the carpet where Wilson was shot in the foot. They also recovered Wilson’s wallet, which contained approximately $732.00, on the passenger side of his pickup truck. The weapon used in the robbery was never recovered.
Detective Ewing noted the difficulty of developing suspects, since initially they had only been given nicknames. He testified that Marcus Gant, also known as “Mookie,” was interviewed. Mookie informed the authorities that he had been to Lee’s home prior to the incident to deliver some cocaine. He further stated that upon leaving the house, he saw three individuals, and identified one of them as Cad-dara Hogan. He also identified one of the other individuals as “one of the twins.”
|4Petective Ewing stated that the defendant and his fraternal twin brother, Terrell Rochelle, were arrested and interviewed in depth. Ewing testified that he believed the defendant truthfully told him what happened, to clear his brother from any involvement. The defendant admitted to his participation in “hitting a lick.” Detective Ewing stated that based on this investigation, he could not exclude the defendant as a suspect, and that he had no doubt the defendant was present at the scene of the crime.
Detective Ewing testified that he was able to determine how the defendant, Hogan, and Smith learned that Wilson had money. Apparently, the trio went to the home of their friend, Eric Gilliam, also known as “Little E,” on the evening of February 3, 2010, to celebrate his homecoming from rehabilitation. Wilson, a painter, was repairing a porch on Gilliam’s home while the party was going on. The trio learned that Wilson would receive a partial payment for that job that day.
Hogan testified that he, Smith, and the defendant met at Gilliam’s party around noon and remained there until it was dark outside. He stated that Wilson, whom he knew from the neighborhood, was also at the party. Wilson was “fixing on a porch.” Hogan related that he, Smith, and the defendant planned to rob Wilson, or “hit a lick,” and split the money among themselves. He stated that it was the defendant’s idea to rob Wilson. Hogan admitted that they chose to rob Wilson because they knew he would get paid for fixing the porch. They knew that “Ms. Sharonda” had received her income tax refund and *536 planned to use some of the money to pay Wilson for fixing the porch. They also knew that when Wilson got paid, he would lBgo to that “drug party they always had” at Lee’s house. Hogan stated that all three of them had on black hoodies not because they had planned to wear them, but because it was cold outside. The trio planned to go to Lee’s home because they knew that Wilson would be there.
Hogan stated that once they arrived at Lee’s home, they noticed that Wilson’s truck was there, and waited to see if he would come out the house. When he didn’t, Hogan and the defendant went to the door. The defendant had a small chrome and black .380 in his possession. After listening for a few minutes at the door, the defendant went into the house, while Hogan remained at the door. He noted that the door had a slight crack in it, so they were able to just push it open. Hogan related that the defendant demanded money from Wilson, and when he didn’t comply, the defendant shot him in the foot. They then went outside, where the defendant followed Wilson to his truck, while Hogan and Smith waited at the back of Wilson’s truck. At some point, Wilson was able to obtain his shotgun from his truck.
Hogan testified that he heard shots being fired and ran away. He claims that he was not sure what happened after the shots were fired because the trio split up and ran in different directions. They later heard of Wilson’s murder while the trio was at Smith’s house. The three of them conspired to lie about the events that had transpired and of their involvement with the crime. Hogan denied being the organizer of the events, further stating that he did not force Smith and the defendant to participate.
| fiSmith testified that Hogan instructed him to go get a gun from Hogan’s grandmother’s house. Smith related that due to his fear of Hogan, he did as he was instructed. Smith then went home. He later met up with the defendant and Hogan and walked to Lee’s house. Smith stated that he did not know that they were going to Lee’s house.
Upon arrival at Lee’s house, Smith stated that Hogan forced him to kick in the door. Contrary to Hogan’s testimony, Smith testified that it was Hogan who asked Wilson for money and subsequently shot him in the foot. Smith testified that he started to run when Wilson was initially shot, but Hogan grabbed his arm and told him to stay. When Wilson pulled out his shotgun from his truck, Smith ran. However, he stated that he did hear three shots.
Dr. James Trailor testified that he performed the autopsy on Wilson and prepared the report regarding the autopsy. He stated that Wilson died as a result of a gunshot wound. The bullet entered his upper left arm, exited his arm, and reentered the left side of his chest. The bullet then hit the upper lobe of his left lung, and went through his heart and the middle lobe of the right lobe of his right lung. It cracked the right sixth rib over the lateral part of the chest wall, and was stuck in the tissue right near the rib fracture. Dr. Trailor was able to recover the projectile.
The defendant testified that on February 12, 2010, he and his twin brother reported to the sheriffs department to take a lie detector test. After the brothers were informed that they had failed the lie detector test, the defendant decided to tell the truth, so that his twin brother, Terrell, who had |7no involvement, could be released. He admitted to being at the crime scene, and discussed his version of what transpired.
The defendant denied being at Gilliam’s house all day, and related that he arrived *537 there at 5:30. Smith was not present. Later on that evening, he and Hogan walked to the basketball goal, where Hogan said, “Walk up the street with me so I can get this lick right quick.” The defendant initially refused, but when Hogan asked him again five minutes later, he said, “Okay, come on.” He stated that he did not know Wilson, but Hogan did. They met up with Smith as they were walking toward Lee’s house.
Conflicting with Hogan’s testimony, the defendant testified that they went on the porch and Smith kicked in the door. He stated that Hogan pulled the gun on Wilson, and demanded money. The defendant further stated that it was Hogan who shot Wilson in the foot. At that point, the defendant testified that he ran to a friend’s house.
The defendant was found guilty as charged. On June 26, 2012, he was sentenced to serve life imprisonment, to be served without the benefit of probation, parole, or suspension of sentence, with credit for time served.
The defendant appeals.
LAW AND DISCUSSION
In the defendant’s sole assignment of error, he alleges that the evidence was insufficient to convict him of second degree murder. More specifically, he argues that the conflicting testimony of the state’s witnesses failed to identify the shooter. He argues that his presence at the scene does not make him guilty of second degree murder. The defendant also argues ] sthe State’s entire case was based on the testimony of Hogan, who, he contends, only agreed to testify to save himself.
When issues are raised on appeal, both as to the sufficiency of evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. Jackson, supra.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, cert. denied, — U.S. -, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. Direct evidence provides proof of the existence of a fact, for example, a witness’s testimony that he saw or heard something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evi- *538 denee provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by the evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299. This is not a separate test that applies instead of a sufficiency of the evidence test when circumstantial evidence forms the basis of the conviction. Id. Rather, all of the evidence, both direct and circumstantial, must be sufficient under Jackson to convince a rational juror that the defendant is guilty beyond a reasonable doubt. Id.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35. An accomplice is a competent witness to testify against his co-perpetrator even if the prosecution offers him inducements to testify; these inducements only affect the witness’s credibility. State v. Jetton, 32,893 (La.App.2d Cir.04/05/00), 756 So.2d 1206, writ denied, 00-1568 (La.03/16/01), 787 So.2d 299. The credibility of an accomplice’s testimony is not within the province of the court of appeal to decide. Id. Rather, credibility evaluations are within the province of the jury as trier of fact. Id. The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Eason, supra; State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Ponsell, 33,543 (La.App.2d Cir.8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490.
In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Lewis, 43,402 (La.App.2d Cir.8/13/08), 990 So.2d 109. A tentative identification is not necessarily unreliable. Id.
La. R.S. 14:30.1 provides:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggra *539 vated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juvenile, or terrorism, even though he has no intent to kill or to inflict great bodily harm. (Emphasis added.)
La. R.S. 14:64(A) states:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
The state is not required to show that the defendant’s conduct was the sole proximate cause of the victim’s death in order to satisfy the causation element of this offense. Sufficient proof is presented where it is shown that the defendant’s actions were a “contributing cause” or a “substantial factor” in the resulting death of the victim. State v. Stone, 33,383 (La.App.2d Cir.1990), 758 So.2d 997, writ denied, 2000-2145 (La.6/1/01), 793 So.2d 181. Pursuant to La. R.S. 14:30.1(A)(2), no intent to harm or kill is necessary to be a principal to second degree murder occurring during the course of a robbery. State v. Hampton, 46,363 (La.App.2d Cir.5/18/11), 69 So.3d 614, writ denied, 2011-1467 (La.2/3/12), 79 So.3d 1024, State v. Grant, 623 So.2d 204 (La.App. 2d Cir.1993), writ denied, 629 So.2d 400 (La.1993).
Further, La. R.S. 14:24 identifies those persons who can be classified as principals:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
In the instant case, the state was required to prove that Wilson’s murder occurred during the perpetration of or attempted perpetration of an armed robbery. After a careful review of the record, we find that the testimony and evidence presented overwhelmingly satisfied the state’s burden of proving the essential elements of the charged offense of being a principal to second degree murder.
Even though the testimonies of the defendant, Hogan, and Smith conflicted at times, all three of these participants admitted that they had planned to “hit a lick” that fateful night, and that they were present at the scene when Wilson met his demise. The evidence suggests that either the defendant or Hogan armed himself with a dangerous weapon and attempted to take Wilson’s money, which is a thing of value, from his immediate control. These facts indicate that the elements of attempted armed robbery, |13an enumerated offense for the offense of second degree murder, were met. Unfortunately, the defendant acknowledged his decision to participate in robbing Wilson after Hogan asked him to, and this attempted robbery ultimately led to Wilson’s death.
We find that the evidence presented at trial, viewed under the Jackson standard, was sufficient for the jury to conclude that the defendant was involved in the attempted armed robbery of Wilson, which led to Wilson’s death, pursuant to La. R.S. 14:24 and 14:30. This assignment of error therefore is without merit.
CONCLUSION
For all of the reasons discussed above, we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Hogan pled guilty to the reduced charge of manslaughter via plea bargain agreement.