MOORE, J.
 

 11Willie Carl Jones Jr. appeals his conviction on two counts of second degree murder and his consecutive sentences of life at hard labor without benefits. For the reasons expressed, we affirm.
 

 Factual Background
 

 The first victim, Mark Lioy, was a laborer who was working for Ocean Reef Pools in Bossier City. On Friday, March 20, 2009, he got a paycheck for $600, his biggest weekly paycheck ever. Early that afternoon someone gave him a ride to Cas-cio’s Market on Stoner Ave. in Shreveport, where he usually cashed his paychecks. A friend of Lioy’s, Lorrie Lee Phillips, testified that she often met Lioy at Cascio’s on Friday afternoons; they would do drugs and have sex together. Ms. Phillips testified that around 5:80 p.m. on March 20, after he cashed his check and gave her $20, Lioy got into a car with two people— Jones, whom she recognized from the “hood” as a drug dealer, and Amy Foster, a prostitute and drug user who was also a friend of Ms. Phillips’s. Lioy told Ms. Phillips he would be back in 30-45 minutes, but she never saw him again.
 
 [1]
 

 Surveillance video from Max’s Pawn Shop on East Washington at Youree Dr. showed that the trio came to the shop at 5:49 p.m., Lioy made a $6 payment on a pawned tool, and they left at 5:58. Phone records of calls and texts made from and received by Lioy’s, Jones’s and Ms. Foster’s cell phones showed that they left the Highland area, crossed the river into Bossier City, drove south on Hwy. 71, turned onto Sligo Road and went toward Lake Bistineau. The final calls made from Lioy’s cell were at 6:28 |ap.m., three calls to a woman named Amber Thorn, who testified that she did not know Lioy but admitted she was a regular drug customer of Jones’s. Ms. Thorn also testified that some days earlier, Jones told her that Lioy owed him money for drugs.
 

 Later on the evening of March 20, Bossier Parish deputies received a call that passersby had spotted a body lying off Jerusalem Cemetery Road, a gravel road in southern Bossier Parish near Lake Bis-tineau. It was the body of a middle-aged man who had been shot seven times, including once in the right temple, once in the back, and several times to the hands and arms; no wallet, money, cell phone or ID of any kind was on his person. However, officers were able to lift the victim’s fingerprints; the next day they learned it was Mark Lioy.
 

 Having ascertained Lioy’s identity, deputies contacted his family and employer, and then attempted to retrace his steps. When Ms. Phillips told them that Lioy had driven off with Jones and Ms. Foster, dep
 
 *240
 
 uties wanted to question them. Early Monday morning, March 23, deputies located the car that Jones usually drove — a red Mitsubishi with a white hood — parked by a “shack” on Market Street near Stoner Ave. in Shreveport’s Highland area. The occupants of the shack, Amber Thorn and her aunt, Shelia Horton, told deputies that they had swapped cars with Jones so he could make a drug deal. The two women agreed to follow deputies to the Shreveport Police station for questioning. En route, Ms. Thorn attempted to call Amy Foster, but there was no answer; she also called Jones and told him the police wanted to question him, but he hung up on her. According to Jones’s cell | ¡¡phone records, he was in the Old Bossier area near Interstate 20 when he received this call at 3:48 a.m.
 

 About 10 minutes later, Bossier City police received a report of gunshots being fired in the Old Bossier area. It was not until over three hours later, however, that officers received a call that a woman’s body was lying in front of a house on Wyche Street in Old Bossier. All valuables and forms of ID had been removed from the victim’s clothes, as had been done with Mark Lioy’s body. Detectives later determined this was the second victim, Amy Foster.
 

 Meanwhile, however, Bossier deputies working Lioy’s case in Shreveport were unaware of these facts. At the police station, Ms. Thorn and Ms. Horton agreed to cooperate with deputies: Ms Thorn tried to call Amy Foster again at 4:19 a.m., but there was no answer. She then called Jones again, telling him to bring Ms. Horton’s car to them at Cascio’s, and repeating that the police wanted to talk to him about a murder. According to Ms. Thorn, Jones muttered, “Oh, shit”; remarkably, however, he drove Ms. Horton’s silver Toyota Camry to Cascio’s, meeting deputies there at 4:50 a.m., and then following them to the police station.
 

 After receiving his
 
 Miranda
 
 rights, Jones admitted to deputies that he and Amy Foster had met Lioy at Cascio’s around 5:30 p.m. Friday and then taken him to Max’s Pawn Shop. He stated that he then drove them to the skateboard park on Clyde Fant Parkway for the real purpose of their meeting, oral sex. Jones said that after Ms. Foster did a “trick” on Lioy, he drove them back into town when Lioy suddenly told him to stop the car and |4Iet him out. Jones said that he let him out near Youree Drive at Stoner and never saw him again. After this, Jones and Ms. Foster went to Jones’s mother’s house on Kings Highway, near Byrd High School; they then rented a motel room on North Market Street. Later, he said, he drove Ms. Foster to a house on Trichel Street in Bossier Annex, where a group of Mexican migrant workers was staying, so she could do “tricks” on them. Deputies went to the house on Trichel Street and found it was indeed occupied by a group of Mexican workers with whom they were unable to communicate; however, they searched, and Ms. Foster was not there. With Jones’s consent, deputies then searched the motel room on North Market Street. Finding only two “dime” bags of marijuana in a dresser and no evidence related to Lioy’s murder, they released Jones about 7:30 a.m.
 

 Later that day, deputies ascertained that the female body found on Wyche Street — some 2 ⅜ miles from the house where Jones said he had dropped her off— was that of Amy Foster. She had been shot five times, including once in the face and twice in the chest, and stabbed four times about the neck and thigh.
 

 Deputy Charles Owens testified that when he consented to a search of the motel room, Jones also consented to a search of
 
 *241
 
 his car. Nevertheless, deputies obtained a warrant to search Jones’s mother’s house at 714 Kings Highway, including any outbuildings and motor vehicles. They searched Jones’s ear, a Dodge Intrepid, that was near the house but was actually parked on a vacant next door lot, 716 Kings Highway. In the trunk of the Intrepid, in the spare tire well, they found a plastic bag containing six live |s.357 semi-wadcutter rounds. Richard Beighley, a forensic analyst from the North Louisiana Crime Lab, analyzed these rounds and testified they were consistent with the badly deformed bullets recovered from Mark Lioy’s body. They were also distinctively similar to the semi-wadcutters recovered from Amy Foster’s body. Dep. Owens testified that the search yielded no other evidence connected to the case: no handgun that might have fired the .357 semi-wadcutter rounds, and no cell phones, wallets, jewelry or other personal effects that belonged to Mark Lioy or Amy Foster.
 

 Procedural Background and Trial Evidence
 

 A grand jury returned separate indictments against Jones for the first degree murders of Mark Lioy and Amy Foster, alleging that the homicides occurred while Jones was engaged in armed robberies of the victims. Shortly before trial, the state amended the bills to second degree murder.
 

 Jones filed a motion to suppress the ammunition seized from the Dodge Intrepid on grounds that the car was parked at 716 Kings Highway while the search warrant described the premises at 714 Kings Highway.
 
 [2]
 
 At a hearing held before jury selection began on September 13, 2010, Jones’s mother, Lucille Jones Taylor, testified that the Intrepid belonged to Jones, as she had recently “put it in his name.” She also testified that she owned the house and lot at 714 Kings Highway but not the vacant lot next door; she insisted that when the search warrant was executed, the Intrepid was
 
 not
 
 on her property. She admitted, however, that she had parked her car on the | fivacant lot on two occasions, and that other people in the neighborhood regularly parked cars there. The court denied Jones’s motion to suppress, finding the vacant lot was “basically for public use” with no expectation of privacy.
 

 The state filed a notice of intent to offer other crimes evidence, namely a statement by Benito “Joey” Vasquez, an arrestee who was housed with Jones in Bossier Parish Maximum Security. Jones allegedly told Vasquez that Mark Lioy and Amy Foster “ain’t the only two people he’s killed.” Jones objected to this as improper under La. C.E. art. 404 B; at some point, the state agreed to edit the audio recording and transcript to remove the reference to other homicides. Still, in the portion played to the jury, Vasquez stated that Jones was “a pretty dangerous fellow,” “I wouldn’t mess with him,” and “wherever he was at, I’d try to get on the other side of town.” At trial, however, Vasquez retracted the whole statement, saying he made it only in an effort to get out of jail, he was merely repeating things he had heard on TV, and in fact Jones never said he committed any murders. Jones did not object to the introduction of Vasquez’s redacted statement.
 

 The state also offered the testimony of Marcus Lige, a federal inmate who was housed with Jones at the Bossier Parish jail for “one or two days.” Lige stated that Jones came to him for legal assis
 
 *242
 
 tance, confiding that he was “charged with two or three murders” and authorities were “looking at him for maybe a third or fourth murder.” Jones moved for a mistrial; however, after a recess, the court opted only to admonish the jury to disregard any reference to crimes other than the homicides of Mark Lioy |7and Amy Foster. Lige also testified that Jones said he “lost his temper” with the man, overreacted, and dumped his body in a cemetery; he later lost his temper with the lady, and dumped her body in front of a house.
 

 The state also called Detective Cortez Bridges, whom it offered as an expert in cell phone technology and forensic data recovery. Jones objected, arguing that although the state had included Det. Bridges on its witness list, it had not disclosed that he was being offered as an expert; as a result, the defense had no chance to prepare for his testimony or examine his reports. After the court granted a recess, Jones objected that Det. Bridges had no degree credentials. The court declined to accept the witness as an expert in cell phone technology but accepted him in forensic data recovery and interpretation. He testified that records from cell phone providers indicated not only which cell tower received or sent a signal to a given cell phone, but also which general direction or sector the signal was in. He had analyzed Jones’s cell phone records from Metro PCS and the records of Mark Lioy, Amy Foster, Amber Thorn and Shelia Horton from AT & T. These confirmed that Jones, Lioy and Ms. Foster were together in the Highland area of Shreveport on Friday afternoon, and then together in south Bossier near Lake Bistineau, when Lioy’s phone activity ended at 6:28 p.m. This was near where his body was found on Jerusalem Cemetery Road, and Det. Bridges theorized that Jones stole Lioy’s phone to make the final three calls to Amber Thorn, whom Lioy did not know. Jones’s phone records also showed that he was in the Old Bossier area at 3:58 a.m. Monday, one minute before someone reported hearing gunfire in the vicinity; Amy |sFoster’s body was found on Wyche Street later that morning.
 

 On the afternoon of the fourth day of trial, Juror No. 6 advised the court that she had overheard two other jurors “discussing the case” on a bathroom break that morning. On examination by the court, Juror No. 6 said the first juror remarked she was “disturbed by the blood and gore” on the video,
 
 [3]
 
 and the second replied it “really upsets” her; the first rejoined that she had told her husband she could not sleep because of it. Juror No. 6 admitted she did not see who the chatting jurors were. The district court denied Jones’s motion for mistrial, finding only that the first juror told her husband about some evidence, and nothing more happened. Instead, the court admonished the whole jury not to discuss the case with anyone.
 

 At the close of the state’s case, defense counsel announced that Jones would not testify; the defense rested. By a vote of 10-2, the jury found Jones guilty as charged on two counts of second degree murder.
 

 After trial was completed, Jones filed a
 
 pro se
 
 motion for self-representation which the court denied as moot. Through counsel he filed motions for post verdict judgment of acquittal and new trial, which the court denied, noting the evidence was overwhelming. On both counts, the court imposed the mandatory sentence of life at hard labor without benefits and ordered them served consecutively.
 

 
 *243
 
 Jones now appeals. Through counsel, he raises eight assignments of error;
 
 pro se,
 
 he raises five.
 

 1
 
 ¡¡Discussion: Sufficiency of the Evidence
 

 By his first two assignments of error, Jones urges the evidence at trial failed to establish beyond a reasonable doubt that he committed the murders of Mark Lioy and Amy Foster. In essence, he argues that the entire case was circumstantial. With respect to Mark Lioy, Jones concedes that Det. Bridges testified that the victims’ cell phones were used in the vicinity of a cell phone tower near the cemetery where Lioy’s body was found, but he counters (1) there was no physical evidence to prove that he was present when Lioy was killed, (2) none of Lioy’s personal effects were found in his house, motel room or any of the vehicles he was driving, and (3) none of Lioy’s blood was found in any of those places. He suggests that the evidence does not exclude the reasonable hypothesis that somebody else actually killed Lioy. As for Amy Foster, Jones raises similar arguments, with special emphasis on the fact that despite intensive searches, the state found no blood on Jones’s clothes or the car he was driving when he allegedly shot, stabbed and carried her body to Wyche Street. He contends that between the homicide and when he drove Ms. Horton’s car to Cascio’s, there was nowhere near enough time for him to change clothes and clean the car. He suggests that this evidence leaves open a reasonable hypothesis of innocence.
 

 The state responds that Jones was with Lioy and Foster when Lioy cashed his $600 check, and the cell phone records showed they were all together in south Bossier Parish near the time Lioy was robbed and shot. Also, the cell phone records and the testimony of Amber Thorn show that | iqMs. Thorn called him Monday morning to warn him that police were looking for him; he killed Amy Foster moments later because she could link him to Lioy’s murder. The state adds that the bullets found in both victims were fired from the same gun. Finally, the state submits that a rational jury could accept Det. Bridges’s analysis of the cell phone records which placed Jones at the time and location of each homicide.
 

 The standard of appellate review for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833,
 
 writ denied,
 
 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Dorsey,
 
 2010-0216 (La.9/7/11), 74 So.3d 603;
 
 State v. Knight,
 
 45,231 (La.App. 2 Cir. 5/19/10), 36 So.3d 1163,
 
 writ denied,
 
 2010-1425 (La.1/14/11), 52 So.3d 899. A reviewing court pays great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Williams,
 
 2007-1407 (La.10/20/09), 22 So.3d 867;
 
 State v. Hill,
 
 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 

 Generally, direct evidence consists of testimony from a witness who actually
 
 *244
 
 saw or heard an occurrence, proof of the existence of which is at issue.
 
 State v. Lilly,
 
 468 So.2d 1154 (La.1985). Circumstantial evidence, by contrast, consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.
 
 Id.; State v. Bounds,
 
 38,330 (La.App. 2 Cir. 5/12/04), 873 So.2d 901. When circumstantial evidence forms the basis of the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. On appeal, the reviewing court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events.
 
 State v. Davis,
 
 92-1623 (La.5/23/94), 637 So.2d 1012,
 
 cert. denied,
 
 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 Id.; State v. Henry,
 
 46,406 (La.App. 2 Cir. 8/10/11), 73 So.3d 958.
 

 Second degree murder requires proof that the defendant killed a human being either (1) with the specific intent to kill or inflict great bodily harm or (2) while engaged in the perpetration or attempted perpetration of an enumerated offense, including armed robbery. La. R.S. 14:30.1 A(l), (2). Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences 112to follow his act or failure to act. La. R.S. 14:10(1);
 
 State v. Harrison,
 
 46,325 (La. App. 2 Cir. 5/18/11), 69 So.3d 581. Specific intent need not be proved as a fact, but may be inferred from the circumstances of the transaction and the conduct of the defendant.
 
 State v. Brown,
 
 2003-0897 (La.4/12/05), 907 So.2d 1;
 
 State v. Harrison, supra.
 
 Specific intent to kill may be inferred from the act of pointing a gun and firing at a person in close proximity.
 
 State v. Lewis,
 
 2009-1404 (La.10/22/10), 48 So.3d 1073;
 
 State v. Brown,
 
 42,054 (La.App. 2 Cir. 8/29/07), 965 So.2d 580,
 
 writ denied,
 
 2007-1939 (La.2/15/08), 976 So.2d 174. Armed robbery is defined as the taking of anything of value belonging to another, from the person of another or that is within his immediate control, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64.
 

 Direct evidence placed Lioy with Jones and Ms. Foster shortly before the homicide. The testimony of Lioy’s office manager and a copy of his paycheck proved that he received a check for $600 on the afternoon of March 20; the testimony of his frequent partner in recreational drugs and sex, Ms. Phillips, proved that he cashed the check at Cascio’s, got in a car with Jones and Ms. Foster, and drove away; video surveillance and the pawn ticket showed that the trio went to Max’s Pawn Shop, where Lioy made a payment, and then they left together.
 

 Beyond this, the evidence is admittedly circumstantial. The bullets later recovered from the car parked next to Jones’s house were consistent with those that shot Lioy. Amber Thorn, one of Jones’s drug customers, testified that Lioy owed Jones money for drugs. Even though Lioy’s body 113was stripped of all valuables, none of these were found in Jones’s possession, so the evidence might not support a finding that Jones robbed Lioy. Nonetheless, the doctor who performed the autopsy on Lioy testified that the victim sustained seven gunshot wounds, including one to the head, from a sufficient distance that no soot or powder was present on the skin. This is a circumstance from which a jury could rationally find a specific intent to
 
 *245
 
 kill.
 
 State v. Lewis, supra.
 
 Notably, nobody ever saw Lioy alive after he left Max’s Pawn Shop with Jones and Ms. Foster. Cell phone records show that after they left Max’s, the trio went to south Bossier near Lake Bistineau, the area where Lioy’s body was later found by Jerusalem Cemetery Road.
 

 The direct evidence that Lioy left Shreveport with Jones and Ms. Foster, coupled with the circumstantial evidence of the cell phone records that put them together in the area where the body was found, and that the bullets found in Jones’s trunk were consistent with those that shot Lioy, all support a finding beyond a reasonable doubt that Jones killed Lioy, with a specific intent either to kill or inflict great bodily harm. The suggestion that somebody else might have intervened in this sordid sequence of events and shot Lioy is simply not sufficiently reasonable to dissuade a reasonable jury from its finding of Jones’s guilt. This assignment of error lacks merit.
 

 With respect to Amy Foster, the evidence shows that other than Jones, she was the only other person who might have known the facts of Lioy’s murder. Early Monday morning, Amber Thorn called Jones and tipped him off that the police wanted to question him about Lioy. Ten minutes later, ||4neighbors reported hearing gunfire in Old Bossier; cell phone records again confirmed that Jones was in that area at the time. Jones coolly drove Ms. Horton’s car to Cascio’s parking lot, and then accompanied police to the station. He gave a statement that he was with Ms. Foster until shortly before her death, changing it only enough to say he dropped her off to do “tricks” on Mexicans in Bossier Annex, a place where the cell phone records did not put him. Ms. Foster’s body was found in Old Bossier, where the shots were heard. The bullets seized from Jones’s car were distinctively similar to those recovered from Ms. Foster’s body. In our view, these circumstances would convince a rational jury beyond a reasonable doubt that Jones killed Ms. Foster lest she implicate him in Lioy’s murder.
 

 As an alternative hypothesis, Jones argues that between the reported shooting, at 8:59 a.m., and when he met police at Cascio’s, at about 4:50 a.m., there was not enough time for him to haul Ms. Foster’s body to Wyche Street, dump it on someone’s lawn, and remove all traces of blood from his clothes and the car. This thesis might be tenable, if the record showed that the victim was killed elsewhere, hauled and dumped. However, the crime scene photos show a large amount of blood on the ground where her body lay, suggesting that she was put out of the car on Wyche Street, shot and stabbed, and left to bleed to death on the patchy lawn. The limited time frame is not sufficiently reasonable to dissuade a rational juror from its finding of Jones’s guilt. This assignment of error lacks merit.
 

 11,Motion to Suppress
 

 By his third assignment of error, Jones urges the court erred in denying his motion to suppress. He argues that the search warrant, which was not introduced into evidence, described 714 Kings Highway, while the police actually searched a car parked next door, at 716 Kings Highway. His mother, Mrs. Taylor, testified that she did not own the vacant lot next door; the car was parked there only because it had broken down and the towing service put it there; she parked there the day of the search only because police officers had blocked her own driveway. Citing
 
 State v. Jewell,
 
 338 So.2d 633 (La.1976), Jones argues that a search may exceed the scope of the warrant only in limited, specified circumstances, none of which were shown in this case. He specifi
 
 *246
 
 cally contends that there was nothing in plain view that would have supported a search, and no evidence that officers conducted an inventory search of the car.
 

 The state responds that the vacant lot at 716 Kings Highway was a “common area” often used by other people in the neighborhood, and Jones had no expectation of privacy when he parked the Intrepid there. Also, there was no fence or any other marker to indicate the exact property line, so officers acted reasonably in treating the driveway next door to Mrs. Taylor’s house as part of the curtilage subject to the umbrella of the search warrant.
 

 A search warrant must particularly describe the person or place to be searched. U.S. Const., Amend. IV; La. Const. Art. 1, § 5; La. C. Cr. P. art. 162 C. The purpose of the particularity requirement is to assure that the search “will be carefully tailored to its justifications, and will not take on | lfithe character of the wide-ranging exploratory searches the Framers intended to prohibit.”
 
 Maryland v. Garrison,
 
 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987);
 
 State v. Sterling,
 
 99-2598 (La.4/25/00), 759 So.2d 60. The description contained in the search warrant is adequate if it is sufficiently detailed to allow officers to locate the property with reasonable certainty and avoid searching the wrong premises.
 
 State v. Sterling, supra; State v. Korman,
 
 379 So.2d 1061 (1980). The courts have frequently held that when the warrant describes one address, and officers search the adjacent address, this discrepancy will not invalidate the warrant.
 
 State v. Alonzo,
 
 95-2483 (La.5/31/96), 675 So.2d 266;
 
 State v. Sterling, supra; State v. Grant,
 
 10-83 (La.App. 5 Cir. 10/26/10), 52 So.3d 149, and cases cited therein. Officers may rely on the outward appearance of the property.
 
 State v. Grant, supra.
 
 They may also rely on the “physical layout of the premises and their use,”
 
 United States v. Prout,
 
 526 F.2d 380 (5 Cir.1976),
 
 cert. denied,
 
 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976). Courts extend some latitude to officers “in the dangerous and difficult process of making arrests and executing search warrants.”
 
 Maryland v. Garrison,
 
 480 U.S. at 87, 107 S.Ct. at 1018. When evidence has been seized pursuant to a facially valid warrant, the burden of proof in a motion to suppress is on the defendant. La. C. Cr. P. art. 703 D;
 
 State v. Porche,
 
 2006-0312 (La.l1/29/06), 943 So.2d 335.
 

 Officers investigating Lioy’s murder wanted to search the residence and vehicle of one of the last two people who saw him alive, Jones. They obtained a warrant for 714 Kings Highway, where Jones lived with his |17mother. At the time, they had no reason to expect that Jones, his mother and other visitors frequently parked their cars in the vacant lot next door, 716 Kings Highway. Photos taken at the time of the search showed a short, chain-link fence virtually straddling half the length of the house. The purpose of this fence is not apparent, and there is nothing else to indicate a property boundary. The layout of the two lots supports the officers’ reasonable inference that the Intrepid was parked on a portion of the property described in the warrant. This search was “consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment.”
 
 Maryland v. Garrison, supra.
 
 The district court did not err in denying the motion to suppress, and this assignment of error lacks merit.
 

 Other Crimes Evidence
 

 By his fourth and fifth assignments of error Jones urges the district court erred
 
 *247
 
 in denying his motions for mistrial when the state’s witness Marcus Lige referred to other crimes committed by Jones, in violation of the district court’s order, and when the state’s witness Benito Vasquez testified that Jones was “a murderous person.” Jones argues that these comments did not satisfy any of the criteria by which other bad acts may be admitted under La. C.E. art. 404, outweighed any possible probative value, and surely contributed to the guilty verdicts.
 
 State v. Blank,
 
 2004-0204 (La.4/11/07), 955 So.2d 90;
 
 State v. Crandell,
 
 43,262 (La.App. 2 Cir. 6/18/08), 987 So.2d 375,
 
 writs denied,
 
 2008-1582, 2008-1659 (La.3/27/09), 5 So.3d 139, 140,
 
 cert. denied,
 
 — U.S.-, 130 S.Ct. 183, 175 L.Ed.2d 115 (2009).
 

 |1sThe state responds that even though the court denied the motion for mistrial with respect to Lige, it admonished the jury to disregard his reference to other crimes, a remedy which was within the court’s discretion for conduct which did not warrant a mandatory mistrial under La. C. Cr. P. art. 770.
 
 State v. Narcisse,
 
 426 So.2d 118 (La.1983). The state does not respond to the motion for mistrial with respect to Vasquez.
 

 Evidence of other crimes, wrongs or acts is generally inadmissible. La. C.E. art. 404 B(l). A mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during trial or in argument, refers directly or indirectly to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible. La. C. Cr. P. art. 770(2). However, when such a remark or comment is made by someone other than the judge, district attorney, or a court official, the court shall promptly admonish the jury to disregard the remark or comment. La. C. Cr. P. art. 771(2). The court may also grant a mistrial if there is a legal defect in the proceedings that would make any judgment entered upon a verdict reversible as a matter of law. La. C. Cr. P. art. 775(3).
 

 Mistrial is a drastic remedy which should be declared only on a clear showing of prejudice by the defendant.
 
 State v. Leonard,
 
 2005-1382 (La.6/16/06), 932 So.2d 660;
 
 State v. Kemp,
 
 39,358 (La.App. 2 Cir. 3/11/05), 896 So.2d 349,
 
 writ denied,
 
 2005-0937 (La.12/09/05), 916 So.2d 1052. The determination of whether actual prejudice has occurred lies within the sound discretion of the trial court and will not be disturbed on appeal absent 119an abuse of that discretion.
 
 State v. Weary,
 
 2003-3067 (La.4/24/06), 931 So.2d 297,
 
 cert. denied,
 
 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006);
 
 State v. Smith,
 
 43,136 (La.App. 2 Cir. 4/23/08), 981 So.2d 200.
 

 Lige and Vasquez were jailhouse companions of Jones’s. Because they were not court officials, their references to other bad acts allegedly committed by Jones did not warrant mandatory mistrial under Art. 770(2). Jones moved for mistrial when Lige, a federal inmate temporarily housed in Bossier, testified that Jones told him he was being investigated for "maybe a third or fourth murder”; after a recess, the court denied the mistrial but admonished the jury to disregard any reference to other crimes, in accord with Art. 771(2). Lige then stated what Jones had told him about the Mark Lioy and Amy Foster homicides, testimony that seems cumulative of the other trial evidence. Given Lige’s credibility issues and the limited substance of his testimony, we find no clear showing of prejudice.
 

 As for Vasquez, a Bossier Maximum inmate, the state agreed that his recorded statement referred to other bad acts; by agreement, these were edited
 
 *248
 
 out, and Jones did not object to the redacted version. The unedited portion referred to Jones as “a pretty dangerous fellow,” but this was not a reference to other bad acts committed by Jones; it was plainly Vasquez’s commentary on the charged offenses. Moreover, Vasquez testified emphatically that his statement to Det. Griffith was totally false, made only in an effort to curry favor with authorities. The statement could not have affected the verdict; the district court did not err in denying the mistrial. These assignments of error lack merit.
 

 120Alleged Juror Misconduct
 

 By his sixth assignment of error, Jones urges the court erred in denying a mistrial when jurors were influenced by external sources or failing to inquire into those external influences. As noted, based on its examination of Juror No. 6, the court found only one violation in that a juror had discussed the case with her husband; it admonished the whole jury not to discuss the case. Jones argues that he established an “extraneous influence,” a form of unauthorized communication which he contends is “presumptively prejudicial.”
 
 State v. Sanders,
 
 33,778 (La.App. 2 Cir. 10/4/00), 769 So.2d 183. He concludes the court committed reversible error in not allowing him to interrogate the juror or jurors involved and determine the extent of the extraneous influence.
 

 The state responds that Juror No. 6 could neither identify which jurors were chatting in the ladies’ restroom nor that any external influence occurred. The state submits that on this showing, the court’s admonition to the jury was entirely sufficient.
 

 Any private communication, direct or indirect, with a juror after the beginning of trial is deemed presumptively prejudicial, if not made with full knowledge of all parties and pursuant to court order or rule.
 
 State v. Bates,
 
 508 So.2d 1346 (La. 1987);
 
 State v. Sanders, swpra.
 
 The presumption is not conclusive, but a heavy burden rests upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.
 
 State v. Sinegal,
 
 393 So.2d 684 (La.1981);
 
 State v. Sanders, supra.
 
 Prejudice may be shown by evidence that an [21 extrinsic factual matter tainted the jury’s deliberations.
 
 State v. Day,
 
 414 So.2d 349 (La.1982);
 
 State v. Sanders, supra.
 

 Juror No. 6 testified that she did not see which jurors were talking, so there was no reasonable way to accommodate Jones’s request to examine those jurors. Moreover, even taking at face value Juror No. 6’s account of their conversation, the two jurors addressed no details of Jones’s guilt or innocence and showed no intent to influence each other. Finally, one of the jurors may have told her husband that some of the evidence was gory, but there is absolutely no evidence that the husband, or any other extraneous source, attempted to influence her. Simply put, there is no showing of influence.
 
 State v. Day, supra.
 
 On this record, the court did not abuse its discretion in denying the motion for mistrial and admonishing the jury not to discuss the case with anyone. This assignment lacks merit.
 

 Nonunanimous Verdict
 

 By his seventh assignment of error, Jones urges the court erred in instructing the jury that it did not have to reach a unanimous verdict in order to convict. He concedes that La. C. Cr. P. art. 782 A authorizes a felony trial “by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” He contends, however, that only one other state (Oregon) allows a 10-2 vote to con
 
 *249
 
 vict or acquit in noncapital felony cases, and that numerous recent Supreme Court cases have “reexamined” the application of unanimity in jury verdicts.
 
 Jones v. United States,
 
 526 U.S. 227, 119 S.Ct. 1215, 148 L.Ed.2d 311 (1999);
 
 Apprendi v. New Jersey,
 
 580 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000);
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002);
 
 United States v.
 

 Booker,
 
 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).
 

 The state responds that the Louisiana Supreme Court has repeatedly upheld Art. 782 A against constitutional challenges.
 
 State v. Bertrand,
 
 2008-2215 (La.3/17/09), 6 So.3d 738;
 
 State v. Edwards,
 
 420 So.2d 663 (La.1982);
 
 State v. Jones,
 
 381 So.2d 416 (La.1980).
 

 At Jones’s request, the court polled the jury and found that 10 of 12 jurors concurred to find him guilty on both counts, satisfying Art. 782 A. As the state has shown, the Louisiana Supreme Court has upheld the constitutionality of Art. 782 A, as has this court.
 
 State v. Divers,
 
 38,524 (La.App. 2 Cir. 11/23/04), 889 So.2d 335,
 
 writ denied,
 
 2004-3186 (La.4/8/05), 899 So.2d 2,
 
 cert. denied,
 
 546 U.S. 939, 126 S.Ct. 431, 163 L.Ed.2d 327 (2005). We see no basis to reconsider this issue and deviate from established jurisprudence. We also note that in the federal case most precisely on point, a plurality of the U.S. Supreme Court approved Oregon’s minimum requirement of a 10-2 vote to sustain a criminal conviction.
 
 Apodaca v. Oregon,
 
 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). This assignment lacks merit.
 

 Excessive Sentence
 

 By his eighth assignment of error, Jones urges the court imposed an unconstitutionally harsh and excessive sentence. He argues that consecutive life sentences without benefits constitute nothing more than purposeless and needless imposition of pain and suffering in violation of La. Const. Art. 1, § 20.
 
 State v. Telsee,
 
 425 So.2d 1251 (La.1983);
 
 State v. Sims,
 
 410 So.2d 1082 (La.1982).
 

 | gjThe state responds that the court properly considered Jones’s presentence investigation report (“PSI”), his two prior felony convictions and the fact that these two murders occurred just a few months after his release from prison.
 

 The courts have repeatedly upheld the mandatory sentences under R.S. 14:30.1 as constitutional and consistent with the federal and state provisions against cruel, unusual or excessive punishment.
 
 State v. Daniel,
 
 378 So.2d 1361 (La.1979);
 
 State v. Small,
 
 46,632 (La.App. 2 Cir. 11/16/11), 78 So.3d 825, and citations therein. A court may depart from a mandatory minimum sentence only upon finding “clear and convincing evidence” to rebut the presumption of constitutionality, which requires a showing that the defendant is exceptional, in that “because of unusual circumstances, this defendant is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.”
 
 State v. Johnson,
 
 97-1906 (La.3/4/98), 709 So.2d 672;
 
 State v. Small, supra.
 

 The district court reviewed the PSI, noting Jones’s social and criminal history. Jones pled guilty in 1995 to attempted second degree murder, in an incident arising from a failed carjacking at Byrd High School, just behind his mother’s house on Kings Highway. For this he drew a 25-year sentence, during which he was convicted of possession of contraband in a penal institution. He was paroled on good time in August 2008; the instant offenses occurred only seven months later. Testimony at trial showed that in his seven
 
 *250
 
 months of freedom, he was known in the Highland area for his | ^involvement in the drug and prostitution trade. The killing of Mark Lioy appeared to stem from Jones’s illegal enterprise, and the killing of Amy Foster from an intent to silence her. The record does not show that Jones is “exceptional” under
 
 State v. Johnson, supra.
 
 This assignment lacks merit.
 

 Pro se Assignments
 

 Jones also filed a
 
 pro se
 
 brief raising five assignments of error to which the state has not responded. Because they are insubstantial, we will address them only briefly.
 

 (1) The court erred in imposing a sentence based upon facts not decided by jurors. Jones contends that at sentencing, the court mistakenly stated that Ms. Foster had been shot four times and stabbed 10 or 12 times, when in fact witnesses testified that she was shot five times and stabbed four. However, the number of shots or stabs is not an element of second degree murder and has no bearing on the mandatory life sentence prescribed by R.S. 14:30.1 B. There was no effect on the sentence.
 

 (2) The court erred by not addressing Jones’s motion for self-representation until four days after he was convicted. Jones’s handwritten motion was dated August 30, 2010; trial began on September 13 and ended on September 17. However, the motion was not file-stamped by the clerk of court until September 21, four days after trial. The record neither explains Jones’s delay in properly filing his motion nor shows that when trial began with counsel, he called the pending motion to the court’s attention. The court did not err in denying this untimely motion.
 
 State v. Hegwood,
 
 345 So.2d 1179 (La.1977);
 
 State v. Lee,
 
 39,969 (La.App. 2 Cir. 8/17/05), 909 So.2d 672,
 
 writ denied,
 
 2006-0247 (La.9/1/06), 936 So.2d 195.
 

 (3) The court erred when it did not make a timely disclosure to Jones of all available exculpatory evidence known to the prosecutor (the fact that Det. Bridges was an expert witness). Jones contends that the state did not reveal that it intended to use Det. Bridges as an expert until “just minutes” before he took the stand to be qualified. He submits that this was an untimely disclosure of exculpatory evidence. The state is indeed required to disclose exculpatory evidence under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and La. C. Cr. P. art. 718. However, Jones has not shown, and we cannot perceive, that Det. Bridges’s testimony was in any way exculpatory. Without such a showing, there is no violation of discovery.
 
 State v. Hawkins,
 
 96-0766 (La.1/14/97), 688 So.2d 473;
 
 State v. Hopkins,
 
 39,258 (La.App. 2 Cir. 3/2/05), 897 So.2d 854,
 
 writ denied,
 
 2005-1238 (La.12/16/05), 917 So.2d 1107.
 

 (4) The court erred in allowing Det. Bridges to testify as an expert witness. Specifically, he contends Det. Bridges never stated the facts upon which his opinion was based, in violation of La. C.E. art. 705 B. However, the state introduced printouts of the cell phone records of Mark Lioy, Amy Foster and Amber Thorn from AT & T Mobility, verified by that provider’s radiofrequency engineer, Robert Weir, and of Jones from Metro PCS, verified by that provider’s custodian of records, Timothy Lowndes. Both these experts confirmed that the records identified the tower and sector that sent or received each signal, and that this information could be used to locate where the customer was when he sent or received a call or text. Det. [^Bridges methodically referred to these records in his testimony. The assertion that he failed to state facts to support
 
 *251
 
 his opinion under Art. 705 B is completely without basis. Moreover, the legislature has recognized the validity of cell phone tracking, La. R.S. 38:9109 A, and the courts have utilized it.
 
 State v. Hampton,
 
 46,368 (La.App. 2 Cir. 5/18/11), 69 So.3d 614;
 
 State v. Richards,
 
 2010-0247 (La.App. 4 Cir. 8/18/10), 47 So.3d 598,
 
 writ denied,
 
 2010-2372 (La.10/7/11), 71 So.3d 305.
 

 (5) The court erred when it did not make a timely disclosure to Jones of all the evidence or information known to prosecutors (the Amy Foster crime scene report). Jones argues that if the state had given him this report sooner than three days before trial, the outcome of the proceedings would have been different. He admits, however, that the Bossier Police Department finished transcribing the 123-page report only on September 9, 2010, and gave it to defense counsel on September 10. Neither the six-month delay for completing this lengthy report nor the one-day delay in forwarding it to counsel appears unreasonable.
 

 Conclusion
 

 In addition to the assignments of error, we have reviewed the entire record pursuant to La. C. Cr. P. art. 920(2) and find nothing we consider to be error patent. For the reasons expressed, Willie Carl Jones Jr.’s convictions and sentences are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Ms. Phillips did not recognize the car Jones was driving; based on the surveillance video, it was a small, light-colored car, and not any of the other cars described in this record.
 

 [2]
 

 . Inexplicably, the state did not offer the search warrant into evidence. However, Jones’s motion to suppress alleged that it described "714 Kings Highway, City of Shreveport, Parish of Caddo, and all outbuildings and motor vehicles.”
 

 [3]
 

 . These were actually still photos. There was no video of the deceased victims.