Judgment rendered November 10, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,559-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

HENRY HEATH                           Appellant

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. F2018-8

Honorable Stephen G. Dean, Judge

* * * * *

LAVALLE B. SALOMON, APLC                    Counsel for Appellant
By: Lavalle B. Salomon

PENNY WISE DOUCIERE                          Counsel for Appellee
Interim District Attorney

K. DOUGLAS WHEELER
AMANDA M. WILKINS
Assistant District Attorneys

* * * * *

Before PITMAN, STONE, and McCALLUM, JJ.

**PITMAN, J**.

A jury convicted Defendant Henry C. Heath, Jr. of 20 counts of indecent behavior with a juvenile. The trial court sentenced him to a year and six months at hard labor on each count and ordered that the sentences be served consecutively. Defendant appeals his convictions and sentences. For the following reasons, we affirm Defendant's convictions and sentences.

## FACTS

On January 8, 2018, the state filed a bill of information charging Defendant with 61 counts of indecent behavior with a juvenile. On January 23, 2019, the state filed an amended bill of information charging Defendant with 20 counts of indecent behavior with a juvenile. On March 12, 2019, the state filed a second amended bill of information charging Defendant with 20 counts of indecent behavior with a juvenile in Richland Parish, in violation of La. R.S. 14:81. The state alleged that between the dates of January 1, 2016, and December 31, 2016, Defendant committed indecent behavior with a juvenile, i.e., S.G., whose date of birth is February 8, 2000.

Trial commenced with jury selection on March 18, 2019, and evidence was adduced on March 19 and 20, 2019.

S.G. testified that she met Defendant at church sometime in December 2014, when she was 14 years old. After she expressed an interest in hunting, Defendant agreed to take her and began to visit her home. Defendant, S.G., her mother ("K.G."), her sister and Defendant's nieces and nephews periodically cooked and watched movies together, among other things. She and Defendant located hunting spots near her house and put out corn for the deer. Around April 2015, she dated Defendant's son. She testified that

Defendant did not approve of their relationship and told her that his son was not good enough for her. She characterized Defendant as acting like a jealous boyfriend.

S.G. recalled that her first sexual contact with Defendant was in December 2015, at Mack Borden's father's house in West Carroll Parish where he had taken her to hunt. The two left the Bordens' house and went to Defendant's home located in Morehouse Parish. There, Defendant undressed her, fondled her breasts and other areas on her body and put a vibrator inside her vagina. Defendant additionally pleasured himself. At some point, Defendant also kissed her. She testified that she asked Defendant to stop, but he did not. Defendant asked her not to tell anyone about their encounter because they could both get into trouble.[1]

S.G. testified that in January 2016 she continued to see Defendant almost daily at her home in Richland Parish, which was across the road from the home of her grandparents, Francis Dolores and Darryl Caston. Occasionally, Defendant would walk by her and touch her buttocks and grab her breasts. She and Defendant continued to prepare their hunting spot, usually close to dark, throwing corn along a tree line some distance from her grandparents' house and behind the mobile home across the road where her family lived. She stated that while putting out the corn, Defendant would pull her pants down, pull her shirt up or touch her breasts or buttocks. She testified that this type of activity occurred at least five times in January 2016 behind her house and behind her grandparents' house. She never told anyone about these incidents.

---

[1] The only charges before this court are those that occurred in Richland Parish.

2

S.G. testified that in February 2016, she and Defendant continued putting out corn, even though it was not hunting season. She stated that Defendant was at her house daily and sexually assaulted her every day. She recalled a day when she and Defendant took his truck behind her grandparents' house where Defendant undressed her and touched her breasts and vagina. He also used his mouth in her "private area." Defendant engaged in identical contact with her on another day in February after returning from Walmart. He stopped his truck on Ruff Road and proceeded to undress her and touch her breasts and vagina. She testified that this type of activity occurred at least four times in February 2016.

S.G. testified that she did not experience any contact from Defendant in March 2016. Defendant and her mother were fighting, so he stayed away. In April 2016, S.G. and her family planned to move to Gainsville, Texas, to assist her uncle in the opening of his new restaurant. She stated that prior to their departure, Defendant gave her a vibrator and a cellphone. She did not refuse the vibrator because she knew that would make Defendant angry. The family moved to Texas in May and there was no contact between her and Defendant on the cellphone, with the exception of one text message she received from him saying, "I see how it's going to be."

S.G. further testified that she and her family returned to Louisiana either at the end of July or early August 2016. Defendant traveled to Texas to help her family with their move. Shortly thereafter, she and her family went to Minnesota to visit her brother. On the drive home, they stopped in Branson, Missouri, where Defendant met them and insisted that she ride with him on the way back to their home, but K.G. refused to allow her to ride alone with Defendant, which upset him. After their return home,

3

Defendant resumed his daily visits to her home and began staying overnight, sleeping on the couch.

In August 2016, there was sexual contact between Defendant and S.G. virtually every day. S.G stated that when her mother left the room, Defendant would casually grab her buttocks and breasts. She also stated that the touching was on both the outside and inside of her clothing. She testified that this type of activity occurred at least five times in August 2016. She further testified that there was not any sexual contact between her and Defendant in September, October or November 2016. During those months, she did not see Defendant very often because he was working. She did, however, occasionally text him on K.G.'s phone to determine if he would attend her softball games.

S.G. testified that in December 2016, when hunting season began, she and Defendant resumed putting corn out for the deer at dusk. Defendant's sexual contact with her also resumed. She stated that Defendant again pulled down her pants, put his mouth on her, used his fingers on her vagina and touched her breasts. She told him to stop on a couple of occasions. She testified about another incident which occurred around Christmas after she and K.G. picked up some pecans from her grandparents' property and stored them in her grandmother's barn. She and Defendant went to retrieve the pecans and, once inside the unlit barn, Defendant proceeded to pull her pants down and touch her breasts. At no point did she report any sexual contact to her mother or anyone else, stating that she was afraid she would get in trouble.

S.G. further testified that Defendant's illicit acts came to light in April 2017, when her sister found the vibrator in her room that Defendant had

4

previously given her. Her sister took a picture of it and showed it to K.G. K.G. questioned her about the vibrator, and she replied that Defendant had given it to her. K.G. contacted the sheriff's department, and an investigation ensued.

Other witnesses at trial included K.G., Ambi Bundy, Mack Borden, Jr., Debbie Borden, Dolores Caston, Dennis Platt and Wanda Vallery.

K.G. testified that she and her family met Defendant at Victory Tabernacle Church in Bastrop, Louisiana, in December 2014. After Christmas, Defendant began coming to her home a few times per week to take S.G. hunting and to put out corn. She expressed displeasure with Defendant many times because he only paid attention to S.G. and not to her younger daughter. She stated that she and Defendant never developed any type of personal relationship, but Defendant would sometimes act as if he were interested in her after she expressed her displeasure. Defendant would also cook with her family and do other typical family activities with them, such as grocery shopping. She stated that in November 2015 when hunting season began again, Defendant was at their house three or four times a week. It was during this time that he would take S.G. to the Bordens' house to hunt. She testified that she permitted S.G. to stay the night at the Bordens' house with Defendant because he assured her that his sister would be there.

K.G. further testified that by January 2016, Defendant was still visiting her home three or four times a week. In May 2016 when the family moved to Texas to help at her brother's restaurant, she found a cellphone that Defendant had given S.G. She surmised that Defendant had purchased the phone for S.G. because she would not allow Defendant to have S.G.'s number. She stated that she called Defendant and asked if he had given S.G.

the phone. He admitted that he had, "because she wanted it." The family stayed in Texas only a short while. She called Defendant and asked him to help them move back to Louisiana. The family moved to Caston Road, across the street from her parents.

K.G. further testified that Defendant met her family in Branson, Missouri, on their way back from visiting her son in July 2016. Defendant became upset when she refused to allow S.G. to ride back home with him. She stated that she had stopped letting S.G. ride in Defendant's vehicle because he would not allow her younger daughter to ride with him. She corroborated S.G.'s testimony that in August 2016, Defendant began staying the night at their home. She stated that Defendant was there almost every day, with the exception of every other weekend, when he kept his son.

K.G. also testified that she never had any suspicion that Defendant and S.G. had any type of relationship until one night after church when Defendant declared that instead of staying the night, he would go home. When S.G. asked why, Defendant raised his voice at her and told her he was going home because that is what he wanted. S.G. tried to get Defendant to talk to her, but he refused. K.G. asked Defendant whether something was going on between him and S.G., and he said no. She stated that the family did not see Defendant again for a couple of days, but he eventually returned, remaining in contact with them until March 2017.

K.G. testified that in April 2017, her suspicions were confirmed when her younger daughter found the vibrator that Defendant had given S.G. When she confronted S.G. with the picture, S.G. admitted that Defendant had given it to her before they left for Texas "so she would have it." K.G.

6

contacted the sheriff's department and also contacted Defendant via text

message. Excerpts of these text messages follow:

> K.G.: How could you feel right about buying my
> daughter a vibrator? What gave you that right?
>
> Defendant: I'm driving it'd be about 30 minutes or so
> and I'll get back with you
>
> ….
>
> Defendant: I'm not going to ask you to get out this late if
> it's ok I'll let you know when I can meet you and for
> what it's worth I'm truly sorry for the hurt I've caused
>
> K.G.: I just want to know why
>
> Defendant: I'll talk to you when I can
>
> K.G.: You have hurt us and want me to wait for when it's
> convenient for you. That's not fair. Nothing ever
> changes. Whatever you want
>
> K.G.: I found the blue jeans too. Is there anything else
> you bought her to hide from me.
>
> Defendant: I don't remember any blue jeans all I
> remember is the camo ones
>
> ....
>
> K.G.: Stupid me wanted to be loved so bad that I let you
> hurt my baby. I will pay for it for a long time. I at least
> deserve to know why you would do something like this.
> She trusted you.
>
> K.G.: We all trusted you. You sure had me fooled. I
> really thought you cared. When I told you before
> something was going on I should have gone with my gut.
> But no. I trusted you.
>
> Defendant: You think it doesn't hurt me knowing that I
> hurt people that I care about over foolishness yes I did
> care and still do that's why I can't talk.
>
> K.G.: You only cared about my daughter and getting in
> her pants. You didn't give a crap about me or [my
> younger daughter]. We were just in your way so you had
> to tolerate us. [My younger daughter] is hurt now
> because she wanted a daddy so bad. I screwed up once

again. Never will I again. Ain't no man on earth worth what my baby is going through.

Defendant: I do care about you and [your younger daughter] but ya'll do make it hard to

....

K.G.: Guess your not gonna help me understand why. There's nothing else to say then.

Defendant: I told you I would but I'm in the bed now.

K.G.: Always some excuse. I'm done.

K.G.: I hope someday I can look you in face and tell you I forgive you.

Defendant: I hope so

K.G.: I don't know how you sleep at night. We don't. She has been in my bed every night. Crying. She clings to me.

Defendant: believe me I don't.

K.G. further testified that she felt responsible for what happened to S.G. because she allowed Defendant to continue to come to her home because she wanted to be loved.

Ambi Bundy testified that she attended church with Defendant and S.G., at Victory Tabernacle Church, where only about 50 to 60 people attended at that time. She served in the children's ministry in which S.G. participated when she was approximately 14 years old. She stated that she observed several interactions between S.G. and Defendant that concerned her. On a few occasions, she observed Defendant and S.G. together, alone, in the hallway near the fellowship hall. Each time she saw them, they were talking closely and standing closer together than appropriate. On another occasion, while having a children's retreat, she observed S.G. and Defendant having a cookie fight consisting of the two of them putting icing on each

8

other's faces, wiping it off and eating it. At one point, Defendant grabbed S.G. from behind in a bear hug and wrestled with her. She testified that she spoke to Defendant about the cookie fight and told him he needed to act more like an adult and not an immature person. She stated that later that night, S.G. did not feel well and requested permission from her mother to leave the retreat. K.G. obliged and S.G. left with Defendant. She testified that she called K.G. the next day asking if S.G. had made it home and determined that although S.G. and Defendant left the retreat at midnight, they had not arrived home until 4:00 a.m.

Bundy also testified that while S.G. was dating someone, Defendant appeared jealous. Defendant worked in the kitchen at the church. When S.G.'s boyfriend went through the food line, Defendant jokingly refused to serve him; and, after they sat down to eat, Defendant came out of the kitchen and sat between them. She stated that at some point, she confronted Defendant and asked if he and S.G. were involved. Defendant denied that they were and stated he was being a father figure to her. She stated that all of the incidents she observed occurred in 2014, but she was unsure of the dates.

Mack Borden also attended Victory Tabernacle Church, where he served in the kitchen with Defendant and tended to the lawn. He testified that he observed S.G. and Defendant at church "poking around." He also observed S.G. inside Defendant's truck. He stated that Defendant brought S.G. to hunt two or three times at his father's house in Pioneer, Louisiana. On one occasion, he, Defendant, S.G. and a few of his relatives ate dinner together at his house. Around 9:30 p.m., S.G. stated that she wanted ice cream, and S.G. and Defendant left the home together. He asked where they

9

were going to get ice cream at that hour, and Defendant replied, "Walmart." They did not return until after everyone in the home had fallen asleep. He testified that when he asked Defendant if there was something going on between him and S.G., Defendant denied that his relationship with her was anything more than that of a father figure. He stated he told Defendant their relationship did not look like one between a father and a daughter.

Debbie Borden, Mack Borden's wife, testified that she was familiar with K.G. and S.G.'s entire family. While at a youth rally at Victory Tabernacle Church, she observed Defendant staring at S.G. as she was speaking with her friends. She also overheard Defendant tell S.G., "You don't care nothing about that though, do you [S.G.]? That don't bother you at all?" She stated that she observed Defendant rub S.G.'s leg on one occasion and also observed Defendant and S.G. inside Defendant's truck with S.G. sitting next to him, even though no one was in the passenger seat. She testified that Defendant sometimes appeared jealous of S.G.'s interactions with others. She stated that all of her observations occurred in 2015 or 2016.

Dolores Caston, S.G.'s grandmother, testified that she frequently saw Defendant at S.G.'s residence. She stated that Defendant taught S.G. how to shoot a bow and a gun, how to put out corn and hunt and how to drive. Because S.G. was the only child who received Defendant's attention, she became suspicious of their relationship. In December 2016, S.G. and Defendant went out to her shed to retrieve pecans for K.G. to sell. She stated that they stayed in the shed about 20 minutes, explaining when they returned that they were searching for another box for the pecans because the original box had gotten wet. She testified that she did not believe their story.

10

Dennis Platt testified that he attended church with S.G.'s family and observed interactions between S.G. and Defendant. He stated that he observed S.G. sitting on the "hump" of the seat in Defendant's truck and also driving the truck without a driver's license. He also stated that the two were always together and that they acted as a couple. At some point, he questioned Defendant about what he had observed, but Defendant denied any involvement with S.G.

Wanda Vallery, an investigator with the Richland Parish Sheriff's Office, was the final witness for the state. She testified that on April 7, 2017, she spoke with K.G. regarding inappropriate contact involving her daughter, S.G. During their initial conversation, K.G. informed her that she did not know much about the contact. K.G. turned over the vibrator to her, and she eventually interviewed S.G.

Vallery further testified that she learned that S.G. had her first sexual contact with Defendant starting in December 2015 in West Carroll Parish, where the Bordens' house was located. S.G. also had sexual contact with Defendant in December 2015 at his home in Morehouse Parish. During the Morehouse Parish incident, S.G. relayed that Defendant took her to his house, undressed her, played with her breasts, put his mouth on her breasts, kissed her, performed oral sex, put his fingers inside her vagina and used a vibrator on her while he pleasured himself.

Vallery also testified that the inappropriate contact took place between S.G. and Defendant in January 2016 in Richland Parish at S.G.'s home. S.G. told her that Defendant visited her residence three to five times per week. He eventually started staying overnight in August 2016. Vallery corroborated S.G.'s testimony regarding incidents occurring in January

11

2016, February 2016, April 2016, August 2016 and December 2016. She elaborated that in the February 2016 truck incident, after Defendant pulled S.G.'s pants down, stuck his fingers inside her vagina and put his mouth on her, he then went to the back of his truck and masturbated. She further stated that there was no indication that Defendant ever penetrated S.G. and no allegations that S.G. performed oral sex on Defendant. She testified that S.G. did not undergo any medical examinations because forensic exams must be conducted within 72 hours of a sexual assault. She also did not look for any DNA evidence because Defendant and S.G. were often together beyond sexual contact and three months had passed since their last sexual encounter.

On April 10, 2017, Vallery served Defendant with a protective order. She asked him if he knew what the documents referenced. He replied that he did and that he was sorry for the pain he had caused S.G.'s family.

After the state rested, Defendant testified in his own defense. He stated that he was arrested in this case on November 29, 2017, and that during the time period in question, he was employed and worked a typical five-day work week. He confirmed that he met S.G. and her family in December 2014 and first went to their home around Christmas to take S.G. hunting. He stated that they only hunted for as long as S.G. was on break from school. He explained that he was closer to S.G. than her younger sister because he and S.G. shared the same outdoor interests. He stated that he visited S.G.'s family home when his son was not at his home, but that S.G.'s family sometimes visited his home as well. He explained that when he and S.G. went to retrieve pecans out of the Castons' shed, the bottom fell out of the box. He and S.G. found another box and scooped the pecans up and

placed them into the new box.  There was no light in the shed, so they had to use a flashlight.

Defendant further stated that S.G. and her mother had a toxic relationship.  K.G. often asked him to speak with S.G.  He denied purchasing a phone for S.G., stating that he purchased it as a backup and kept it in the seat of his work truck.  He stated that he never gave the phone to S.G. and she never asked for the phone, although she took the phone to use it.  He also stated that he never contacted S.G. on that phone or S.G.'s own phone.  He claimed that he did not even know S.G.'s phone number.  He denied purchasing the vibrator for S.G.  In fact, he claimed that he had never seen it prior to these allegations and also denied that he ever had any sexual contact with S.G. anytime or any place.  He stated that when the two hunted at the Borden house, there were always other people present.  He also stated that S.G. could not have been seen sitting closely to him in his truck because it has a center console.  He admitted that S.G. did drive his truck because he was teaching her how to drive.  He stated that the corn piles were 123-124 yards from the house on the side with windows.  He further stated that he stopped going to S.G.'s house because he was expected to be there all the time, even when he wanted to spend time with his own family.

On cross-examination, Defendant stated that he never had an opinion about S.G. dating his son and accused both S.G. and K.G. of lying.  He admitted that in December 2015, he left the Bordens' house around 7:30 p.m. or 8:00 p.m. with S.G. because she wanted him to take her to Philadelphia, Mississippi, to meet a boy.  She also wanted him to take her to Monroe, Louisiana, to the indoor trampoline park.  He refused to take her to meet the boy, but did stop by the trampoline park, which closed.  Instead.

13

they went to Raising Cane's and picked up food and then sat in the Walmart parking lot and ate. Thereafter, they returned to the Bordens' house sometime after 10:30 p.m. He stated that Borden never asked him if there was something going on between him and S.G. He also stated that they put out corn close to dark because he did not usually arrive at their home until that time and that S.G.'s younger sister accompanied them once or twice.

Defendant admitted that Bundy told him he should act as an adult after the cookie fight incident at the youth retreat, but never said anything to him about his behavior with S.G. He accused not only Bundy of lying, but also Borden, Platt and Debbie regarding their observations of his conduct toward S.G., as well as their conversations with him regarding the same. He also testified that S.G. lied when she said he touched her inappropriately in January, February, August and December 2016.

On March 20, 2019, a unanimous jury found Defendant guilty as charged on all 20 counts of indecent behavior with a juvenile.

On July 17, 2019, Defendant was sentenced. Prior to sentencing, the trial court noted that Defendant was a 45-year-old man who resided in Morehouse Parish, that the allegations concerned sexual contact with a juvenile victim for a period of approximately one year and that he was found guilty of all 20 counts of indecent behavior with a juvenile. It noted that Defendant did not have a juvenile or adult criminal history. It also noted that it reviewed and considered Defendant's social history included in the presentence investigation report, as well as written letters on his behalf and those written against him.

In accordance with La. C. Cr. P. art. 894.1, the trial court found the following aggravating factors: there was an undue risk Defendant would

14

commit another crime during a period of a suspended sentence and probation; Defendant was in need of correctional treatment or custodial environment that could be provided most effectively by his commitment to an institution; and a lesser sentence would deprecate the seriousness of Defendant's crime. Additionally, as an aggravating factor, it found that Defendant used his position or status to facilitate the commission of the offenses. It did not find any applicable mitigating factors.

Defendant was sentenced to one year and six months at hard labor on each count, and these sentences were ordered to be served consecutively for a total of 30 years. He was given credit for time served since his arrest. Defense counsel objected to the sentence in open court, and subsequently, on August 1, 2019, filed a motion to reconsider sentence, arguing that the sentence was excessive, disproportionate and a needless infliction of pain and suffering. Defendant also argued that the trial court did not adequately consider mitigating circumstances, including his social history and lack of criminal history, nor did it consider the undue hardship he would face. Finally, he argued that his sentence should be served concurrently because the acts constituted a common scheme or plan. He further asserted that the court failed to justify the imposition of consecutive sentences. The motion was denied on August 15, 2019.

Defendant appeals his convictions and sentences.

## DISCUSSION

*Insufficiency of the Evidence*

Defendant argues that his conviction is not sufficiently supported by the testimony at trial and that the jury's guilty verdict is contrary to the law and evidence. He asserts that S.G. is no child, but a sexually active teenager

15

who kept records of her sexual activity, which did not include any contact with him. In fact, he contends that there is no physical, DNA or otherwise scientific evidence that corroborates S.G.'s allegations. S.G. is the only witness who alleges that sexual activity occurred. He suggests that he was a friend of S.G.'s family and frequently visited their home. He argues that although S.G. suggests that sexual activity occurred on a daily basis, there are months where there are no claims of misconduct. He asserts that S.G.'s testimony was inconsistent, unreliable and "underpinned and untruthful."

Moreover, Defendant argues that the state introduced a cell phone, allegedly provided by him to S.G. The phone was determined to never have been used. In fact, there was no communication between him and S.G. on any phone that she possessed. Ultimately, he argues that S.G.'s testimony was not believable and that she repeatedly denied that any sexual activity had ever taken place between them. Accordingly, Defendant contends that the state failed to prove his guilt beyond a reasonable doubt and his convictions should be reversed.

The state conversely argues that the evidence was sufficient to convict Defendant of 20 counts of indecent behavior with a juvenile. It asserts that proof was provided through nine witnesses, including Defendant, and evidence of the vibrator and cell phone that Defendant provided to S.G. It argues that members of the church testified to the nature and appearance of Defendant's suspicious behavior toward S.G., that he admitted that he spent time at S.G.'s residence and that he put out corn alone at night with S.G. It asserts that Defendant accused every witness of lying, but argued that his own self-serving statements were allegedly true. It argues that Defendant

16

had the means, motive and opportunity to commit the 20 counts of indecent behavior with a juvenile and that his convictions should be affirmed.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004).

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 15-2291 (La. 4/4/16), 190 So. 3d 1203. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *State v. Smith*, 44,998 (La. App. 2 Cir. 3/31/10), 34 So. 3d 386, *writ denied*, 10-0980 (La. 12/10/10), 51 So. 3d 722.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Higgins*, 03-1980 (La. 4/1/05), 898 So. 2d 1219; *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 153 So. 3d 438. This is equally applicable to the testimony of victims of sexual assault. *State v. Ware,* 06-1703 (La. 6/29/07), 959 So. 2d 459; *State v. Elkins*, *supra*. Such testimony alone is sufficient even when the state does not introduce medical, scientific or physical evidence to prove the commission of the offense. *State v. Dale*, *supra*; *State v. Elkins*, *supra*.

17

La. R.S. 14:81 provides in pertinent part:

A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:

(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons. Lack of knowledge of the child's age shall not be a defense [.]

\* \* \*

H. (1) Whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.

Touching the victim's genitals satisfies the elements of a lewd or lascivious act and the intent to gratify the offender's or the victim's sexual desires. *State v. Robinson*, 49,821 (La. App. 2 Cir. 5/20/15), 166 So. 3d 395, *writ denied*, 15-1400 (La. 9/16/16), 206 So. 3d 201.

When viewed in a light most favorable to the prosecution, the evidence adduced at trial was sufficient to convict Defendant of 20 counts of indecent behavior with a juvenile. The evidence showed that over approximately a year, Defendant, then a 42-year-old man, had consistent inappropriate contact with S.G., who was 14 years old when they met and the abuse began. Specifically, Defendant repeatedly pulled S.G.'s pants down, touched her breasts, touched her buttocks, pulled her shirt up and even performed oral sex upon her.

Members of Victory Tabernacle Church testified that they observed interactions between Defendant and S.G., that Defendant's behavior with

S.G. seemed anything but fatherly and that they confronted him about his behavior. These facts establish that Defendant had the opportunity to commit these abhorrent crimes.

Moreover, in his text conversations with K.G., Defendant never denied committing the acts. In fact, he apologized and characterized his conduct as "foolish." Additionally, when Vallery served Defendant with a protective order, he again apologized. It was not until he testified that Defendant denied any wrongdoing.

The state arguably did not identify 20 separate incidents throughout testimony, as S.G. only described a couple per month, but when S.G. was asked about each monthly encounter, she verified that there was sexual contact between her and Defendant five times, four times, or one time, respectively. She also testified that the contact happened every time she was around Defendant, and Defendant admittedly spent at least three to five days at her residence during the months alleged.

Accordingly, these assignments of error lack merit.

*Excessive Sentence*

Defendant has also raised as error that the trial court erred in imposing upon him a sentence which was excessive, disproportionate and a purposeless imposition of pain and suffering; the trial court erred in failing to adequately comply with the provisions of La. C. Cr. P. art. 894.1; the trial court erred in failing to properly address factors or circumstances in mitigation and/or what should compel a lesser sentence than that imposed upon him; the trial court erred in imposing consecutive sentences totaling thirty years; and the trial court erred in failing to provide any explanation for the imposition of consecutive sentences.

Defendant argues that he is a 45-year-old father and first-offender and has maintained employment. He contends that despite the above, the trial court did not find any mitigating circumstances, nor did it identify any specific aggravating factors that would justify the imposition of an aggregate 30-year sentence. He also argues that he is hardly the worst of offenders. He also notes that the victim stated that she has "moved on" and was planning to enroll in college and get married. Therefore, the sentence imposed is not justified.

Defendant further argues that consecutive sentences are unsupported by the record because the trial court failed to articulate a specific reason for imposing consecutive sentences. He contends that the crimes were part of a single continuing activity with one individual. Therefore, consecutive sentences are excessive.

The state argues that Defendant's sentence was not excessive because it fell within the statutory limits. Additionally, it argues that the court incorporated the presentence investigation report, which contained both derogatory and positive information. The record, the state contends, contains an adequate factual basis to support the sentences imposed, despite Defendant's lack of criminal history. The record also showed that S.G. initially had difficulty moving on with her life. Defendant's maximum sentencing exposure was 140 years, and he received only 30 years, less than a quarter of the maximum sentence. Moreover, it argues that the court is vested with great discretion in imposing consecutive or concurrent sentences. Additionally, it asserts that while this case involved the same victim, the crimes occurred at different times, in different places, happened under different circumstances and involved different acts. Accordingly,

Defendant failed to meet his burden in showing an abuse of discretion in imposing consecutive sentences.

Appellate review of sentences for excessiveness is a two-pronged inquiry.  First, the appellate court examines the record to determine if the trial court used the criteria set forth in La. C. Cr. P. art. 894.1.  The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects adequate consideration of the guidelines of the article.  *State v. Smith*, 433 So. 2d 688 (La. 1983); *State v. Davis*, 52,453 (La. App. 2 Cir. 2/27/19), 265 So. 3d 1194; *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596.  The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence.  La. C. Cr. P. art. 894.1(C).  The goal of La. C. Cr. P. art. 894.1 is an articulation of the factual basis for the sentence, not simply a mechanical compliance with its provisions.  *Davis*, *supra*.  Where the record clearly shows an adequate factual basis for the sentence, resentencing is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1.  *Id.*

The defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation are important elements to consider.  *State v. Jones*, 398 So. 2d 1049 (La. 1981); *Davis*, *supra*; *Boehm*, *supra*.  There is no requirement that specific matters be given any particular weight at sentencing.  *Davis*, *supra*; *Boehm*, *supra*.

Second, a sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.  *State v. Dorthey*,

623 So. 2d 1276 (La. 1993); *Davis*, *supra*. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166; *Boehm*, *supra*.

A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, a sentence will not be set aside as excessive. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *Davis*, *supra*; *Boehm*, *supra*.

As a general rule, maximum or near-maximum sentences are reserved for the worst offenders and the worst offenses. *State v. Jones,* 52,672 (La. App. 2 Cir. 5/22/19), 273 So. 3d 585*, writ denied,* 19-01075 (La. 10/1/19), 280 So. 3d 160.

In cases involving multiple offenses and sentences, the trial court has limited discretion to impose the sentences concurrently or consecutively, but the justification for consecutive sentences must be supported by the record. La. C. Cr. P. art. 883; *State v. Lynn*, 50,575 (La. App. 2 Cir. 5/18/16), 196 So. 3d 607. When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. *Id*. Concurrent sentences arising out of a single course of conduct are not mandatory. *Id*. Consecutive sentences under those circumstances are not necessarily excessive. *Id*. It is within the court's discretion to make sentences consecutive rather than concurrent. *Id.*

Factors to be considered in imposing consecutive sentences include: the gravity and viciousness of the offense, the harm done to the victims, the risk of danger to the public, the offender's criminal history and potential for rehabilitation. *State v. Austin*, 49,061 (La. App. 2 Cir. 7/16/14), 146 So. 3d 716; La. R.S. 14:81(H)(1).

The record reflects that the sentencing court complied with La. C. Cr. P. art. 894.1. It reviewed the presentencing investigation and stated specifically its findings regarding the guidelines, noting that there was an undue risk Defendant would commit another crime during a period of a suspended sentence and probation, Defendant was in need of correctional treatment or custodial environment that could be provided most effectively by his commitment to an institution and that a lesser sentence would deprecate the seriousness of Defendant's crimes. It also found that Defendant used his position or status to facilitate the commission of the offenses.

The trial court did not find any mitigating factors. However, it considered Defendant's lack of criminal history, his social history and favorable letters on his behalf. For these reasons, the first prong of the excessiveness test was met.

The second prong of the excessiveness test is whether the sentence violates La. Const. art. I, § 20, by being grossly out of proportion to the seriousness of the offense or nothing more than purposeless infliction of pain and suffering. Here, Defendant used his position to lure S.G. to fulfill his desires. He took advantage of this child under the guise of being the father figure in her life. S.G. kept his secret because she was scared she could get in trouble. Moreover, Defendant did not receive the maximum sentence.

23

Each count carries a possible sentence of 7 years. Defendant could have been sentenced a total of 140 years. Instead, he received one year and six months on each count, for a total of 30 years—within the lower statutory range.

Further, while Defendant's actions could be considered as one course of conduct, Defendant engaged S.G. in many acts of indecent behavior at different times, in different places and in different ways for approximately a year. The trial court's imposition of consecutive sentences is supported by the record. Consequently, the sentences are not disproportionate to the facts and circumstances of this case, nor do they shock the sense of justice. Therefore, the trial court did not abuse its discretion in imposing consecutive sentences.

Accordingly, these assignments of error lack merit.

## ERROR PATENT

The error patent review of the appellate record reveals that the trial court improperly advised Defendant of the prescriptive period for seeking post-conviction relief, as required by La. C. Cr. P. art. 930.8. It informed Defendant that his judgment of conviction and sentence became final on the day of his sentence. This court hereby advises Defendant that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under La. C. Cr. P. arts. 914 or 922. *See* La. C. Cr. P. art. 930.8.

## CONCLUSION

For the foregoing reasons, the convictions and sentences of Defendant Henry C. Heath, Jr. are affirmed.

**AFFIRMED**.

24